No. 81-115

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

---

DEWEY EUGENE COLEMAN,

          Petitioner and Appellant,

-vs-

STATE OF MONTANA,

          Respondent and Respondent.

---

Appeal from:  District Court of the Sixteenth Judicial District,
In and for the County of Rosebud, The Honorable
A. B. Martin, Judge presiding.

Counsel of Record:

    For Appellant:

        Moses Law Firm, Billings, Montana
        Charles Moses argued, Billings, Montana

    For Respondent:

        Hon. Mike Greely argued, Attorney General, Helena,
        Montana
        John Maynard argued, Asst. Atty. General, Helena,
        Montana
        John S. Forsythe argued, County Attorney, Forsyth,
        Montana

---

        Submitted:  April 29, 1981

        Decided: AUG 2 8 1981

Filed: AUG 2 8 1981

Thomas J. Kearney
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Coleman appeals from a Rosebud County District Court dismissal of his petition for post-conviction relief. Title 46, Chapter 21, Montana Code Annotated.

None of the issues presented by petitioner on this appeal are based in the underlying facts of the criminal cause. Therefore, the facts surrounding Coleman's conviction for the death of Peggy Lee Harstad will not be recited. A full text of these facts can be found in our decision of an earlier appeal, State v. Coleman (1978), 177 Mont. 1, 579 P.2d 732. Operative procedural facts will be discussed with reference to specific issues offered by the petitioner.

Petitioner Coleman presents eight issues for resolution by this Court:

1. Is post-conviction relief a new civil action or a continuation of the previous criminal cause?

2. Should the judge have recused himself when his testimony is required as to certain claimed violations?

3. Is petitioner not entitled to post-conviction relief because he has been sentenced to death?

4. Are claims of constitutional violations barred by res judicata because they were decided in earlier Coleman appeals?

5. Were thirteen of Coleman's constitutional claims properly dismissed because "they include vague new allegations, they are too vague to state new claims, or are unsupported by authority and therefore barred by res judicata"?

6. Were seven of Coleman's constitutional claims

properly dismissed because the "new authority cited is either inapplicable to petitioner's case or clearly distinguishable from it leaving the claims barred by res judicata"?

7. Were five of Coleman's constitutional claims waived "because he failed to raise them in his direct appeal and because they are without merit"?

I. POST-CONVICTION RELIEF AS CIVIL OR CRIMINAL ACTION

This Court recognizes the unique nature of the post-conviction remedy. Montana law does not label the proceeding as either civil or criminal, although the chapter providing post-conviction relief is in the criminal procedure title. Title 46, Chapter 21, Montana Code Annotated.

The Montana provisions of section 46-21-101 et seq., MCA, are derived from the Uniform Post Conviction Procedure Act and are essentially similar to the federal statute (28 U.S.C. §2255). The federal courts have consistently held that an action under 28 U.S.C. §2255 is a civil action, independent of the original criminal conviction. See Heflin v. United States (1959), 358 U.S. 415, 79 S.Ct. 451, 3 L.Ed.2d 407. The same rule has been adopted in other states which have adopted the uniform act. Clark v. State (1969), 92 Idaho 827, 452 P.2d 54.

In those states with similar provisions not necessarily deriving from the uniform act, the courts have been consistent in their view that post-conviction relief is civil in nature and independent of the criminal action. State v. Hannagan (Alaska 1977), 559 P.2d 1059; Noble v.

State (1973), 109 Ariz. 537, 514 P.2d 458; State v. Richardson (1965), 194 Kan. 471, 399 P.2d 799; Smith v. State (1968), 79 N.M. 450, 444 P.2d 961; Noble v. Sigler (8th Cir. 1965), 351 F.2d 673, cert. denied, 385 U.S. 853, 87 S.Ct. 98, 17 L.Ed.2d 81, (held only that post-conviction applications are civil in nature); People v. Jones (1975), 30 Ill.App.3d 706, 332 N.E.2d 411; State v. Smith (Mo. 1959), 324 S.W.2d 707; Tolar v. State (Fla. 1967), 196 So.2d 1.

Clearly, this is not intended to be another form of appeal from a criminal case, but a separate civil action aimed at vacating, setting aside or correcting a sentence. There is no Montana case interpreting the nature of the post-proceeding petition, but the proceeding could be closely analogized to that seeking a writ of habeas corpus which this Court decided in 1927 was an independent civil proceeding. August v. Burns (1927), 79 Mont. 198, 213, 255 P. 737, 741.

It is important to note that we do not here intend to erode the fundamental principle discussed below that the sentencing court is the proper court for the post-conviction petition. We are mindful that a party to a civil action is entitled to two substitutions of presiding judges. Section 3-1-801-4, MCA (adopted by order of this Court on December 29, 1976, 34 St.Rep. 26). However, because an applicant for post-conviction relief is directed by the more specific provisions of the post-conviction statute to bring the petition in this Court or in the court that sentenced him, we find that the two judge disqualification grant of section 3-1-801-4, MCA, is unavailable to the post-conviction

-4-

petitioner. In Montana, when a general statute is in conflict with a specific act, the specific statute will take precedence. Section 1-2-102, MCA; In Re Coleman's Estate (1957), 132 Mont. 339, 317 P.2d 880.

We hold that the Montana post-conviction relief procedure is civil in nature and independent of the underlying criminal cause. We will proceed to consider the issues raised on the appeal to this Court. Coleman contends that it was error to deny various of his requests without an evidentiary hearing. It is not error to deny an application for post-conviction relief without an evidentiary hearing if the allegations are without merit or would otherwise not entitle the petitioner to relief. Clark v. State, supra; Tramel v. State (1968), 92 Idaho 643, 448 P.2d 649; Donnelly v. State (Alaska 1973), 516 P.2d 396 (allegations in post-conviction petition were too vague and illusory to warrant evidentiary hearing); Widermyre v. State (Alaska 1969), 452 P.2d 885; People v. Lyons (1978), 196 Colo. 384, 585 P.2d 916; Cook v. State (1976), 220 Kan. 223, 552 P.2d 985.

The decision to admit or deny an application for post-conviction relief is a discretionary one and one that will not be disturbed by this Court absent a clear abuse of discretion. Section 46-21-201, MCA; State v. Ybarra (1974), 22 Ariz.App. 330, 527 P.2d 107; Brudos v. Cupp (1977), 31 Or.App. 25, 569 P.2d 680; Sullivan v. State (1977), 222 Kan. 222, 564 P.2d 455.

II. RECUSAL OF THE SENTENCING JUDGE

Coleman next maintains that the district judge should have recused himself as presiding judge over his petition

-5-

for post-conviction relief in light of the fact that he was the sentencing judge. Petitioner observes that in a post-conviction proceeding, the sentencing judge would likely be called to testify as to, _inter alia_, the propriety of the death sentence. Citing 46 Am.Jur.2d _Judges_, §91 at 158, Coleman submits that a judge should excuse himself as a matter of course if it appears that he may be called as a witness. We disagree.

Coleman fails to recognize the compelling purpose and policy considerations behind that portion of the statute (section 46-21-103, MCA) which directs that a petition for post-conviction relief be filed in either the court of conviction or this Court. See also section 46-21-101, MCA ("may petition the court which imposed the sentence . . .").

Historically, having the sentencing judge preside at the subsequent proceeding has been earnestly advocated for the following reasons: (1) it reduces the burden on the District Court at the place of confinement; (2) it reduces the cost of the proceeding since most of the witnesses likely to be called are probably in the locale where the trial occurred; and, (3) the convicting court is more familiar with the totality of the facts and circumstances surrounding the case. Commissioners' Comment, 11 U.L.A. Post Conviction Procedure §3 (1974). Still another important consideration was enunciated by Idaho Supreme Court Justice Donaldson in Still v. State (1974), 95 Idaho 766, 519 P.2d 435, 437:

> "Although it doesn't matter whether the proceeding is denominated as one for habeas corpus or for post-conviction relief, it is still necessary that the procedures of the Uniform Post-Conviction Procedure Act be followed. The Act was designed to give the

district court which made the initial
determinations a chance to correct any
mistakes or irregularities that occurred in
that court. In addition, that court has
before it all the facts required to make such
a determination. Therefore, the application
or petition for relief must be filed in the
district court where the conviction occurred.
I.C. § 19-4902." (Emphasis added.)

This Court is also of the view that the post-conviction court judge should only recuse himself if the petitioner shows that the judge is the source of material evidence otherwise unobtainable. A trial judge's familiarity with a case does not automatically make him a material witness in post-conviction proceedings. Bresnahan v. Luby (1966), 160 Colo. 455, 418 P.2d 171, 22 A.L.R.3d 1193. The Bresnahan court also emphasized the importance of the trial judge's familiarity with the criminal case which is being collaterally attacked by the civil action. The case at bar involved thousands of pages of testimony, briefs, motions and trial court records. We are mindful of the delay and burden on the efficient administration of justice which would occur if another judge were required to familiarize himself or herself with this record for the purposes of a post-conviction evidentiary hearing. Such delay can only be justified by the strongest showing of materiality and unavailability of evidence sought to be adduced from the sentencing judge.

In this case, petitioner never makes it entirely clear to this Court just what testimony he hoped to elicit from the district judge. Abstract excursions into the mental processes of the sentencing judge do not justify the pro forma recusal of a judge who is fully acquainted with the case. It appears that at best petitioner was attempting

to embark on a fishing trip, hoping to uncover damaging testimony about the fairness of the sentence. Such a discovery procedure would not be allowed with any witness but is especially suspect when directed at the trial judge. See Moore v. People (1971), 174 Colo. 570, 485 P.2d 114.

We find, therefore, that unless some specific and compelling evidence is sought to be adduced from the testimony of the sentencing judge and such evidence can be found nowhere else, for many substantial reasons the trial judge should also preside over a petition for post-conviction relief. The Act itself lends credence to this line of reasoning, and it can be easily inferred that the legislature, in providing that a post-conviction petition should be filed in the court of conviction, intended that the sentencing judge preside over the post-conviction proceeding. The standard of proof regarding the necessity of a sentencing judge's testimony is high; only the strongest showing of materiality and unavailability warrants recusal. See In Re Continental Vending Machine Corp. (2nd Cir. 1976), 543 F.2d 986. The reasons advanced by petitioner for recusal of the trial judge were simply not sufficient to justify a substitution of judges.

III.  APPLICABILITY OF POST-CONVICTION PROCEDURE TO CAPITAL CONVICTIONS

In regard to the third issue, section 46-21-101, MCA, recites in applicable part:

> "Circumstances in which validity of sentence may be challenged. A person adjudged guilty of an offense in a court of record who has no adequate remedy of appeal . . . may petition the court which imposed the sentence, the supreme court, or any justice of the supreme court to vacate, set aside, or correct the

sentence."

This Court has not specifically addressed the question of whether capitally-sentenced defendants are entitled to the protections of the post-conviction relief statute, or whether the automatic sentence review statute, section 46-18-307 et seq., MCA, stands in the place of post-conviction relief. We are aware of the language of Mr. Justice Sheehy in State v. Coleman (1979), ___ Mont. ____, 605 P.2d 1000, 1006, 36 St.Rep. 1134, 1135, cert. denied, ___ U.S. ____, 100 S.Ct. 2952, ___ L.Ed.2d ____, wherein he writes:

> "Because the review conducted by this Court [pursuant to the automatic review provisions of section 46-18-307 through section 46-18-310, MCA] statutorily stands in place of any recourse to the Sentence Review Division, the completion of this review will mark the end of state action upon this cause, excepting any action upon a petition for rehearing." (Emphasis added.)

But cf., State v. McKenzie (1978), 177 Mont. 280, 322, 581 P.2d 1205, 1229.

That language, as noted, only specifically pertains to the sentence review procedure and only generally could it be interpreted to represent a bar to the utilization of post-conviction procedure. The post-conviction statute does not limit its provisions to noncapitally-sentenced persons, nor does the automatic review statute herald itself as an exclusive remedy. Such an interpretation would have to be inferred from the nature of the statutes and policies involved. We do not believe that such an interpretation can be given to these statutes.

In arriving at this conclusion, the plain meaning of the post-conviction statute is particularly persuasive. The statute provided that "a person adjudged guilty of an

offense" is entitled to access to the post-conviction procedure. If the legislature intended this statute to be applied only in noncapital sentences, we must conclude that it would have expressly done so. The terms of "a person" or "any person" and "a crime" or "any crime" are generic terms encompassing a very broad spectrum of acts and actors. Any limitation on the grant of review in post-conviction procedures must be made by the legislature. It is clearly not the power of this Court to interpret the law in a manner contrary to legislative intent. See American Linen Supply Co. v. DOR (1980), ____ Mont. ____, 617 P.2d 131, 37 St.Rep. 1707; Dunphy v. Anaconda Co. (1968), 151 Mont. 76, 438 P.2d 660.

Although the State argues persuasively regarding the legislature's intent regarding finality of sentences, we do not believe that the "plain meaning" of the statute demonstrates its inapplicability to capitally-sentenced offenders. Though aware of these competing legislative interests, this Court does not have the power to go beyond the clear and unequivocal provisions of the law.

IV. APPLICABILITY OF RES JUDICATA TO PETITION FOR POST-CONVICTION RELIEF

Montana law is bereft of any decision on whether the doctrine of res judicata is applicable to a prayer for post-conviction relief. As a general proposition, we have held:

> "The doctrine of res judicata states that a final judgment on the merits by a court of competent jurisdiction is conclusive as to causes of action or issues thereby litigated, as to the parties and their privies, in all other actions in the same or any other judicial tribunal of concurrent jurisdiction." Meagher Co. Water Dist. v. Walter (1976), 169 Mont. 358, 361, 547 P.2d 850,

852.

The doctrine bars reconsideration of an issue if four elements are present: "(1) the parties or their privies must be the same; (2) the subject-matter of the action must be the same; (3) the issues must be the same, and must relate to the same subject-matter; and (4) the capacities of the persons must be the same in reference to the subject-matter and to the issue between them." Brannon v. Lewis and Clark County (1963), 143 Mont. 200, 207-208, 387 P.2d 706, 711.

Aside from the bar of res judicata, this Court has consistently refused to allow relitigation in a collateral proceeding of issues determined in a direct appeal, In Re Quigg (1976), 168 Mont. 512, 544 P.2d 441, and Spurlock v. Crist (1980), ____ Mont. ____, 614 P.2d 498, 501, 37 St.Rep. 1146, in some cases by reaffirming the prior holdings. Digiallonardo v. Betzer (1973), 163 Mont. 104, 105, 515 P.2d 705. Accord, Orricer v. State (1970), 85 S.D. 293, 181 N.W.2d 461.

In light of the dearth, if not complete absence, of guiding Montana case law in this regard, a review of the law as it has evolved and developed with regard to the applicability of res judicata to the Federal Act, 22 U.S.C. §2255, will aid.

Historically the principle of res judicata was not seen to apply to writs of habeas corpus or petitions for relief under §2255. See, Sokol, Federal Habeas Corpus §21.5; cf., Kelley, Finality and Habeas Corpus, 78 W.Va. Law Rev. 1 (1975). However, a new rule has been recognized regulating successive federal motions on grounds previously heard and determined. In Sanders v. United States (1963),

-11-

373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148, the Court stated:

> "Controlling weight may be given to denial of a prior application for federal habeas corpus or §2255 relief only if (1) the same ground presented in the subsequent application was determined adversely to the applicant on the prior application, (2) the prior determination was on the merits, and (3) the ends of justice would not be served by reaching the merits of the subsequent application." 373 U.S. at 15.

Where a trial or appellate court has determined the federal prisoner's claim, discretion may in a proper case be exercised against the grant of a §2255 hearing. Where the trial or appellate court has considered and decided a federal prisoner's claim, it may be open to the §2255 court to determine that, on the basis of the motions, files and records, the prisoner is entitled to no relief. See Thornton v. United States (D.C. Cir. 1966), 368 F.2d 822 (dissenting opinion of Wright, J.).

The res judicata rule has now come to a point in its evolution where it can be said with certainty that a "ground for relief previously considered on appeal from a federal prisoner's conviction cannot be reconsidered on a motion attacking sentence under 28 U.S.C.S. §2255." Torcia, Wharton's Criminal Procedure, §649 at 401 (1976) and cases cited therein.

Res judicata cannot be applied in such a manner as to deprive Coleman of the right to file a post-conviction petition and to use post-conviction procedure. However, res judicata can be used to bar the rehearing of issues already litigated under the rule in Sanders. This interpretation preserves the Montana post-conviction remedy by requiring judicial inquiry into the propriety of the sentence and of the detention, while preventing abuse of the procedure by

-12-

relitigation of a claim previously considered and found insufficient. As discussed in Sanders, relitigation would mean a waste of judicial effort, risking a cluttering of the court's limited resources with collateral attacks already decided on the merits. As one court put it, "judicial economy dictates restrictive limitations on reruns." United States ex rel. Townsend v. Twomey (7th Cir. 1971), 452 F.2d 350, 357, cert. denied, 409 U.S. 854. Some states have gone beyond Sanders and statutorily prohibit more than one collateral attack on a single conviction. See Ill.Ann.Stat. C. 38, § 122-3 (1964); Mo.Sup.Ct.R. 27.26(d); Wyo.Stat.Ann. Tit. 7, § 7-408.3 (1963).

We, therefore, adopt the Sanders criteria as previously quoted in this opinion. We affirm the holding of the District Court that the following twenty-seven issues have been considered previously and decided by this Court and Coleman has alleged no new facts or law with respect to these issues which require additional considerations: F, G, H, I, J, L, M, N, P, R, S, T, V, W, Y, Z, AA, DD, GG, HH, II, JJ, KK, LL, MM, NN, and PP.

V. VAGUENESS AS BAR TO EVIDENTIARY HEARING

The lower court denied thirteen of Coleman's claims because they were too vague to state new claims or were unsupported by authority and were, therefore, barred by res judicata. The State argued in the District Court that "vague new allegations" do not present a proper basis for review. We agree.

Vague rehashings of issues previously adjudicated by a court of competent jurisdiction will not make unworthy

-13-

claims magically meritorious. Naked allegations of injustice cannot constitute new grounds or provide any basis for relief. Cf. Hooker v. People (1970), 173 Colo. 226, 477 P.2d 376. Again, we must defer to the discretion of the District Court in determining if the claims made in the petition are valid or merely previously decided issues in disguise. Andrews v. Morris (Utah 1980), 607 P.2d 816, cert. denied, 446 U.S. 949, 101 S.Ct. 254, 66 L.Ed.2d 120. Moreover, this Court will not disturb the post-conviction court's judgment in this regard absent a clear abuse of discretion. See Redd v. State (1967), 199 Kan. 431, 429 P.2d 925 (emphasizing great discretion in the post-conviction court to make initial judgments regarding validity and substance of claims).

We affirm the holding of the District Court that the following thirteen issues or claims are dismissed as _res judicata_ because the vague new allegations do not affect the validity of the prior determination of this Court: B, E, K, Q, U, X, CC, EE, FF, OO, QQ, RR, and XX.

## VI. APPLICABILITY OF NEWLY DEVELOPED AUTHORITY

We next consider Coleman's contention that seven of his claims were not properly dismissed on the grounds that the new authority cited was either inapplicable or clearly distinguishable, leaving the claims barred by _res judicata_. Cases have recognized that although particular issues have been addressed and determined adversely to a prisoner on a direct appeal, a post-conviction court may nevertheless consider such matters where there has been a substantial change in the applicable law. United States v. Sorenson (D.

-14-

N.Y. 1970), 308 F.Supp. 1268; Robson v. United States (1st Cir. 1975), 526 F.2d 1145. As to these seven claims, we note that no evidentiary hearing is required since these are questions of law only which are involved. A court may, of course, conclude that the changes in the law are inapplicable to petitioner's case. Robinson v. United States (D. Ky. 1967), 264 F.Supp. 146, aff'd, (6th Cir. 1968), 394 F.2d 823, cert. denied, 393 U.S. 1057, 89 S.Ct. 698, 21 L.Ed.2d 698, reh. denied, 393 U.S. 1124, 89 S.Ct. 997, 22 L.Ed.2d 133.

We have reviewed Coleman's seven claims and find that the cases cited by Coleman are distinguishable. We therefore affirm the District Court's holding that the following seven claims are barred by res judicata as the new authority cited is inapplicable or clearly distinguishable: A, C, D, O, BB, TT, and VV.

VII.   DISMISSAL ON GROUNDS OF WAIVER AND LACK OF MERIT

The District Court held that five of Coleman's claims were dismissed because he failed to raise them on his direct appeal. The District Court further found that the five claims were without merit. Because the post-conviction procedure is a new civil remedy, the failure to present claims in earlier proceedings would not bar them from presentation at this time. However, we have reviewed the claims and find the same to be unmeritorious. It was not error for the court to deny them summarily. Sanders, supra; Widermyre v. State (Alaska 1969), 452 P.2d 885; State v. Richmond (1977), 114 Ariz. 186, 560 P.2d 41, cert. denied, 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101; People v.

-15-

Trujillo (1976), 190 Colo. 497, 549 P.2d 1312; Andrews v. Morris, supra.

We affirm the dismissal by the District Court of the following claims on the basis that they are without merit: SS, UU, WW, YY, and ZZ.

Two hearings were held, with petitioner and his attorney present, on the following dates, June 14, 1978 and July 16 and 19, 1978. At the June 14 hearing, counsel for petitioner noted to the court that in view of the fact a presentence report had been prepared, he was not presenting an additional report. The presentence report contained the information that petitioner had never been convicted of any prior felony prior to the present charge. Counsel for petitioner noted:

> "May the record show that on behalf of the defendant, we are not going to call this gentleman [probation officer Thomas Lofland] to the stand at this time for examination. That does not mean we agree with the report, simply that we are not going to call him as a witness.
>
> "THE COURT: Very well. Now the announcement that the defense does not intend to produce any . . . call any witnesses to establish any mitigating circumstances, the Court has before it all matters during the course of the trial, heard the testimony relating to the aggravating circumstances and also some mitigating circumstances . . . ."

Thereafter, the court requested each side to submit proposed findings of fact, conclusions of law and briefs. Both the petitioner and the State having submitted their briefs and findings and conclusions, the court held a second hearing on July 10, 1978.

At the beginning of the July 10 hearing, the trial judge submitted to petitioner's counsel and State counsel his findings and conclusions and thereafter counsel for

-16-

petitioner read into the record a prepared statement in mitigation. With this record before us, we cannot fault the trial court in the sentencing of petitioner. Petitioner, at the first hearing, did not testify in mitigation, declined to examine the officer who prepared the presentence report, and was given an opportunity to submit both further briefs on the sentencing and his proposed findings and conclusions. To now allege that he was denied due process and an opportunity to present his argument is without merit.

Here the trial court was faced with some forty-nine separate claims for relief. While Carter v. Illinois (1946), 329 U.S. 173, 67 S.Ct. 216, 91 L.Ed. 172, holds that states are free to devise their own systems of review of criminal cases, the system, as illustrated in this case, now allows petitioner two appeals, a result not contemplated by the legislature. The July 10 hearing indicates that the trial judge, in pronouncing sentence, stated:

> "In pronouncing sentence I do want the parties to know that this is extremely agonizing for the court to make. I have not looked at the points that have been raised lightly, but many of the arguments raised by the defense, of course have been considered heretofore, and the jury has found from the factual standpoint that the defendant was guilty, beyond a reasonable doubt, and I do not disagree with that conclusion of the jury. One mitigating circumstance is that the defendant has not prior to this time been convicted of any felony, but in view of the enormity of the crime committed, and the court's feeling that this one circumstance does not overcome the aggravated circumstances, I have made to the effect, written findings as required by law. Also I have made conclusions and judgment which have been furnished to the defendant and the state at this time, and I will only at this time read the court's conclusions and judgment."

The sentence and judgment are affirmed. The District

-17-

Court is directed to schedule a new date for execution.

_____
                    Justice

We concur:

_____
        Chief Justice

_____

_____
        Justices

_____
Honorable W. W. Lessley,
District Judge, sitting in
place of Mr. Justice John C.
Sheehy

-18-

Mr. Justice Frank B. Morrison, Jr., dissenting:

I respectfully dissent.

The first problem with this case is that the defendant's conviction was based upon accomplice testimony which was not sufficiently corroborated by independent evidence. The trial court should have directed a verdict in defendant's behalf at the time of trial. I will quote extensively from the transcript to show that the state's case failed.

The second part of the dissent will deal with imposition of the death penalty. That discussion concerns aggravating circumstances versus mitigating circumstances and the conditions under which the death penalty may be imposed.

The defendant, Dewey Eugene Coleman, and Robert Nank met at the Veteran's Hospital in Sheridan, Wyoming. Coleman was being treated for depression. Nank had a history of mental illness.

Coleman and Nank were discharged from the Veteran's Hospital and came to Montana on Nank's motorcycle. They "ran out of gas" between Roundup, Montana and Forsyth, Montana, during the evening hours of July 4, 1974. Coleman testified that they unsuccessfully tried to hitchhike to the nearest town for the purpose of securing some gasoline. It began to get dark and Coleman stated that, since Coleman was black, he was impairing their ability to obtain a ride and Nank directed him to hide himself. Thereafter, according to Coleman, Nank was able to stop a vehicle and obtain a ride. Coleman testified that Nank left with the driver and headed in the direction of Forsyth. Coleman said that Nank returned driving the car sometime later and that he was wet and emotionally upset. Nank instructed Coleman to remove their things from the motorcycle and come with him. Coleman

obeyed. They drove, what was later determined to be the Harstad vehicle, past Forsyth in the direction of Rosebud. Nank stopped between Forsyth and Rosebud and picked up something which appeared to be a blanket. He also stopped at a bar in Rosebud and obtained two Cokes. He advised Coleman that he had killed a woman. Nank headed back toward Forsyth and the Harstad vehicle "ran out of gas". According to Coleman, Nank went into a field and hid something. Coleman was directed to carry a woman's purse, which he did. Coleman looked in the purse, found no money and, pursuant to Nank's directions, threw the purse into a culvert. The two then walked to Forsyth, arriving there in the early morning hours. Nank obtained gasoline in a can and hitchhiked back to the motorcycle. Nank returned for Coleman and they left. Coleman stated that they eventually went to Boise, Idaho, where they rented an apartment and lived until the time of their arrest. Coleman stated that he did not report Nank to the authorities because he was afraid of Nank and because he was afraid of being implicated.

Nank's testimony departs from Coleman's at the point that the victim, Peggy Harstad, stopped to give Nank a ride. In contrast to Coleman's testimony that Nank left alone with the young woman, Nank testified that Coleman went with him. He testified that Coleman was seated in the right front seat and he, Nank, was in the middle next to the driver. Nank stated that as they proceeded toward Forsyth he asked Peggy Harstad to stop the vehicle so that he could urinate. He stated that he and Coleman got out of the vehicle and urinated beside it. They then returned to the vehicle and headed towards Forsyth. As they approached Forsyth, Nank testified that he turned the ignition key off and maneuvered the vehicle to the side of the road. Nank tied Peggy Harstad's

hands together with a yellow nylon rope. He removed her clothing except for her blouse. He attempted to have sexual intercourse with her but could not maintain an erection. He testified that Coleman then "got in the backseat" with Peggy Harstad and had sexual intercourse with her while Nank, now standing on the outside of the car, held onto her foot.

Nank testified that he thereafter dressed the victim and they drove around deciding what to do. Eventually Nank stated that Coleman decided to kill Peggy Harstad. Nank then claimed that he threw the victim over his shoulder, with her hands still tied, and headed down toward the Yellowstone River. He stated that Dewey Coleman hit her on top of the head continuously with a motorcycle helmet and that then Coleman attempted to strangle her with the yellow nylon rope. He stated that when this did not kill the victim that he, Nank, held her head under water in the Yellowstone River until she drowned.

Nank also related how he and Coleman went to Boise, Idaho, obtained an apartment and continued to live until the time of the arrest. Following their arrest, Nank and the defendant were interrogated by law enforcement officials in Boise, Idaho. Coleman maintained his innocence, but Nank confessed and agreed to testify against Coleman.

The testimony of an accomplice is viewed with suspicion because there is a strong motive for lying. In this case a number of law enforcement techniques were used to obtain a confession from Nank. A police officer admitted telling Nank, though it was not true, that he had witnessed a hanging and that it was gruesome. He further told Nank, though it was not true, that Coleman had confessed and blamed Nank for the murder. Nank thereafter exhibited a willingness to confess, but would only do so with some assurance that he

would not hang. He was assured by law enforcement officials that they would make every effort to see that he would not hang and Nank thereafter gave a confession implicating Coleman.

Nank was charged with deliberate homicide, sexual intercourse without consent, and aggravated kidnapping. Only the latter offense carried the death penalty. Nank was permitted to plead guilty and receive noncapital sentences for deliberate homicide and rape. The aggravated kidnapping charge, which carried the death penalty, was held in abeyance until Nank testified against Coleman at the trial. After Coleman's trial the aggravated kidnapping charge against Nank was dismissed.

It is obvious why an accomplice's testimony must be viewed with distrust. Before a criminal charge against a defendant can survive a directed verdict and be submitted to a jury, there must be independent corroborating evidence implicating the defendant in the crime. That corroborating evidence "must raise more than a suspicion of the defendant's involvement in, or opportunity to commit, the crime charged." State v. Warren (1981), ___Mont.___, 628 P.2d 292, 295, 38 St.Rep. 773, 776 (quoting from State v. Kemp (1979), ___Mont.___, 597 P.2d 96, 99, 36 St.Rep. 1215, 1218).

The following excerpt is taken from the first Coleman case, State v. Coleman (Decided April 26, 1978), 177 Mont. 1, 28, 579 P.2d 732:

> "In State v. Keckonen, (1938), 107 Mont. 253, 84 P.2d 341, we held that where the alleged corrobora-tive evidence is equally consonant with a reasonable explanation pointing toward innocent conduct on the part of the defendant, then such evidence does not tend to connect him with the commission of the offense and is in the realm of speculation, not corrobora-tion. Where the claimed corroboration shows no more than an opportunity to commit a crime and simply proves suspicion, it is not sufficient corrobora-

tion to justify a conviction upon the testimony of an accomplice. State v. Jones (1933), 95 Mont. 317, 26 P.2d 341."

In applying the rule, the Supreme Court held, in the Coleman opinion cited above, that there was sufficient corroboration of Nank's testimony to sustain the defendant's conviction. The court found the corroborating evidence to be: A crack in defendant's motorcycle helmet; a hair of Peggy Harstad found on the rope belonging to the two men; the fingerprints on Peggy Harstad's car and in her purse; Negroid pubic hairs similar to defendant's and Negroid head hair found in the victim's vehicle; the evidence that the defendant and Nank were seen together on the same road at approximately the same time that Peggy Harstad disappeared. The Court held that this evidence sufficiently connected the defendant to the commission of the offenses charged to allow the conviction to stand.

The evidence that defendant was on the road with Nank in the vicinity where Peggy Harstad disappeared does not corroborate the testimony of Nank anymore than it corroborates the testimony of Coleman. Coleman testified that he was with Nank on the evening in question. The same is true of Coleman's fingerprints in the purse and in the vehicle. Coleman testified that he was in the Harstad vehicle after Nank returned with the vehicle. He testified that Nank told him to dispose of the purse. He testified that he first went through the purse and examined its contents. The existence of Coleman's fingerprints on the purse's contents and in the vehicle corroborate the testimony of the defendant as well as the testimony of Nank. Therefore, this evidence is "equally consonant with the reasonable explanation pointing toward innocent conduct on the part of the defendant" as it is pointing toward guilt, and therefore, does not qualify

-23-

as corroborating evidence.

If there is any corroborating evidence sufficient to take this case to the jury it must be found in the cracked motorcycle helmet or in reliable testimony that Coleman's pubic hairs were found in the victim's vehicle. A careful reading of the trial transcript shows that sufficient corroboration did not exist.

There was a crack in Dewey Coleman's silver colored motorcycle helmet. The prosecution contended that this corroborated Nank's testimony that Coleman repeatedly struck Peggy Harstad on top of the head with his motorcycle helmet. There was no foundation to show that such a striking could or would crack a motorcycle helmet. There was no testimony to show that the helmet could be cracked in such a fashion without cracking the skull of the victim. This victim had no skull fracture at autopsy.

If the crack in the helmet had any corroborative significance, it was destroyed by the pathologist's testimony. Dr. John Pfaff, board certified forensic pathologist, was called to testify by the State to prove that the decomposed remains which he examined at autopsy were those of Peggy Harstad. He did so. He was then questioned about his findings in connection with the tissue which covered the skull. He testified that if trauma occurred to the top of the head, he would expect to see bleeding into the tissue, but that he saw none. The following excerpts are taken from his testimony:

> ". . . I could find no evidence of bony fracture
> in any of the skeletal remains that I examined.
> In the skull there was no brain tissue remaining.
> The fibrus lining membrane which covers the brain
> and separate from the skull bones was still in-
> tact. This is significant because in cases of
> skull fracture or serious injury to the skull, it
> may become detached and contain bleeding or blood
> extravasation. Such was not observed in this case.

"...

"Question: And within that scalp tissue, did you find any evidence of an incised wound, a laceration or a hemorrhage?

"Answer: I did not.

"Question: Did you examine that dural lining to determine and ascertain whether there was any wound, laceration or hemorrhage?

"Answer: I did.

"Question: And what did you find?

"Answer: I found none.

"...

"Question: Doctor, with respect to a subdural hematoma, is it your testimony that it is possible to have a subdural hematoma without injury to the scalp, without injury or fracturing of the skull and without injury or hemorrhage to the subdural lining, is that possible?

"Answer: It's possible, but there is usually injury to the scalp. There may be no injury to the bone, but if there is a blow struck to the scalp there is usually evidence of that if the patient is living. (Emphasis added.)

"...

"Question: All right. Now in this particular case did you find any evidence to substantiate injury to the head or to the face?

"Answer: In the tissue I examined, I found none.

"Question: Well, whatever you did in that autopsy examination, whatever was available to you, whatever procedure that you used, whatever scientific method that you employed, did you find any injury to the head or to the face?

"Answer: I did not." (Trial Transcript Vol. III, pp. 572, 603, 605, 633.)

The only remaining evidence claimed for corroboration is that pubic hairs similar to Dewey Coleman's were found in the Harstad vehicle.

The record reveals that hair samples were taken from the defendant and subjected to microscopic examination. Both head hair and pubic hair belonging to defendant were available for that examination. The victim's car was vacuumed

-25-

and numerous hair samples obtained from that vacuuming. These samples were also scrutinized microscopically and compared to the hair samples of defendant.

It should be remembered that defendant testified he was in the victim's vehicle after Nank returned driving the vehicle. Therefore, the existence of defendant's hair in the car corroborates defendant as well as Nank and does not provide independent corroborating evidence sufficient to sustain a conviction. However, the State places great reliance upon the fact that defendant's pubic hair was allegedly found in the victim's vehicle. The record does not support the State's position.

In an effort to corroborate the State's case, the prosecution called an expert witness to prove that the hair found in the victim's vehicle was connected to the defendant. Before quoting excerpts from the expert's testimony, it is important to take cognizance of the evidentiary rule here applicable. The offered testimony must be based upon a "reasonable degree of scientific probability" and is inadmissible if the testimony is based upon a mere "possibility". Moen v. Decker Coal Co. (1980), ___Mont. ___, 604 P.2d 765, 36 St.Rep. 2220; Azure v. City of Billings (1979), ___Mont.___, 596 P.2d 460, 36 St.Rep. 968; Farris v. Clark (1971), 158 Mont. 33, 487 P.2d 1307; Stordahl v. Rush Implement Company (1966), 148 Mont. 13, 417 P.2d 95.

The following excerpts are taken from the State's expert witness:

> "Question: Did you make a comparison of the Q-2 hair that you have mentioned as having come from the automobile, and the K-2 as you have mentioned as coming from the head of Dewey Coleman?
>
> "Answer: Yes, I did.
>
> "Question: And what were your findings?

"Answer: I found that there were some similarities between these hairs, but also there were some differences between these hairs.

"Question: As a result of that, what was your final conclusion?

"Answer: I reached no conclusion as to whether or not these hairs could have come from the same source.

"Question: . . . Did you compare the pubic hairs, the known pubic hairs from Dewey Coleman with the Q-29 hairs that were removed from the debris from Peggy Harstad's vehicle?

"Answer: Yes, I did.

"Question: And what were your findings?

"Answer: I found that the--the two black Negroid pubic hairs in the vacuumings from the vehicle, which microscopically match the hairs which were submitted to me as being from the pubic area of Mr. Coleman.

"Question: Will you explain that further please?

"Answer: Well, the fact that the hairs were microscopically alike allowed me to conclude that they could have come from the same source. The two pubic --the two black Negroid pubic hairs from the vacuumings of the victim's vehicle could have come from the pubic area of Mr. Coleman.

". . .

"Question: You don't say it does come from the same source, you say it's possible that it could have come from that source, right?

"Answer: That's correct." (Trial Transcript Vol. VIII, pp. 1802, 1805, 1806, 1905, 1906.) (Emphasis added.)

Under well established law in Montana, this testimony was too speculative to be received in evidence, and once received, could not be relied upon as sufficiently corroborative to sustain a conviction.

This Court's decision in State v. Coleman, supra, wherein the Court identified the corroborative evidence, also relied upon testimony that the victim's hair was found embedded in the yellow nylon rope. Though the existence of such hair would only corroborate that the rope was used in killing the victim, and would not corroborate Nank's testimony

that Coleman was present, the evidence itself was insufficient. The same expert witness sought to relate hair found on the rope with the hair of the victim. He testified that there was brown Caucasian hair embedded in the frayed ends of the rope. He again testified that the hair found in the rope could have been the hair of Peggy Harstad. Under the rule above enunciated such testimony could not be relied upon for corroboration. Additionally, this expert witness testified that he could not determine the sex of the person from whom the hair came. Nank also had brown Caucasian hair.

Interestingly, this same hair expert, testified that he had examined hair taken from the blanket later determined to be a blanket which Peggy Harstad had in her car when she left home. Brown Caucasian hair was found on the blanket. Nank had testified that he and Coleman were on the blanket smoking cigarettes after they had killed Peggy Harstad. Coleman testified that he knew nothing about the blanket and had had no physical contact with it. The examination revealed no Negroid hair upon the blanket.

There simply was no corroboration sufficient to lend credence to the testimony of Nank. The trial court realized this. At the time the prosecution rested, and the defense moved for a directed verdict, the trial court indicated that there was no corroboration but stated he would allow the Supreme Court to rule on the question.

After the defense made a motion for directed verdict because there was not sufficient corroboration for an accomplice's testimony, the prosecution resisted and the following discussion was had:

"THE COURT: Well, I treat this as a real serious motion.

"MR. OVERFELT: In what regard?

"THE COURT: Well, I am not going to grant the motion, but I say it has some merit.

"MR. OVERFELT: I frankly don't think it has any. We could have gotten to the Jury on circumstantial evidence alone, Your Honor, and I'm confident of that.

"THE COURT: Well, all you have shown is the opportunity for this black boy to do it. You have shown plenty of opportunity." (Trial Transcript Vol. IX, pp. 2106-2107.)

As previously noted, corroborative testimony showing only opportunity is insufficient to allow the case to go to the jury. Though the trial court found, as I have found, that there was no corroboration, he nevertheless allowed the case to go to the jury so that the Supreme Court would have an opportunity to review the complete record and make a determination.

I am greatly bothered by this case. The only evidence that the defendant is guilty of the crimes charged comes from an accomplice who was a self-proclaimed liar and who had every reason to perjure himself. This accomplice, though he had a history of violence and sexual deviation, was given a noncapital sentence. The defendant, whose guilt was not proven by competent evidence, had no previous felony record and yet was sentenced to death.

The death sentence in Montana is governed by three statutes which are hereinafter quoted in their entirety:

"Aggravating circumstances. Aggravating circumstances are any of the following:

"(1) The offense was deliberate homicide and was committed by a person serving a sentence of imprisonment in the state prison.

"(2) The offense was deliberate homicide and was committed by a defendant who had been previously convicted of another deliberate homicide.

"(3) The offense was deliberate homicide and was committed by means of torture.

"(4) The offense was deliberate homicide and was committed by a person lying in wait or ambush.

"(5) The offense was deliberate homicide and was committed as a part of a scheme or operation which, if completed, would result in the death of more than one person.

"(6) The offense was deliberate homicide as defined in subsection (1)(a) of 45-5-102, and the victim was a peace officer killed while performing his duty.

"(7) The offense was aggravated kidnapping which resulted in the death of the victim." (Section 46-18-304, MCA.)

"Mitigating circumstances. Mitigating circumstances are any of the following:

"(1) The defendant has no significant history of prior criminal activity.

"(2) The offense was commited while the defendant was under the influence of extreme mental or emotional disturbance.

"(3) The defendant acted under extreme duress or under the substantial domination of another person.

"(4) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

"(5) The victim was a participant in the defendant's conduct or consented to the act.

"(6) The defendant was an accomplice in an offense committed by another person, and his participation was relatively minor.

"(7) The defendant, at the time of the commission of the crime, was less than 18 years of age.

"(8) Any other fact exists in mitigation of the penalty." (Section 46-18-304, MCA.)

"Effect of aggravating and mitigating circumstances. In determining whether to impose a sentence of death or imprisonment, the court shall take into account the aggravating and mitigating circumstances enumerated in 46-18-303 and 46-18-304 and shall impose a sentence of death if it finds one or more of the aggravating circumstances and finds that there are no mitigating circumstances sufficiently substantial to call for leniency. If the court does not impose a sentence of death and one of the aggravating circumstances listed in 46-18-303 exists, the court may impose a sentence of imprisonment for life or for any term authorized by the statute defining the offense." (Section 46-18-305, MCA.)

Under the above quoted statutes the death penalty is imposed if there is an aggravating circumstance and mitigating circumstances do not call for leniency. The first six subsections of section 46-18-303, MCA, are inapplicable to this defendant. The only aggravating circumstance to be found under the statute, if indeed one existed, would be rooted in subsection (7). There is absolutely no corroborating evidence to show that this defendant was involved in aggravated kidnapping resulting in the death of the victim. Even if one were to accept the "hair testimony" offered by the expert, it would only corroborate that defendant committed the act of sexual intercourse. This act could not have resulted in the death of the victim. There is no testimony corroborating Nank's testimony that the defendant participated in an act which resulted in the death of the victim.

A very strong mitigating circumstance exists under 46-18-304, MCA. This defendant has no felony record. Furthermore, under subsection (8) of the statute, any fact existing in mitigation, must be considered by the court. The questionable guilt of the defendant is certainly such a mitigating factor.

We have seen that there is not corroborative testimony to support Nank's version of this matter. I would like to examine Nank's testimony itself to show the total unreliability of that testimony. The purpose of such examination is to show the weakness of the State's case, the likelihood that the defendant is innocent, and the fact that the death penalty should never be imposed in such a circumstance.

Though the jury convicted Coleman, the trial judge should consider the certainty of Coleman's guilt before imposing the death penalty. There was no confession from the defendant. There were no disinterested witnesses directly connecting Coleman to the commission of the offenses charged.

As previously discussed, there was no independent corroborating evidence of any kind. If Nank's testimony lacked credibility, the evidence of Coleman's involvement becomes even more speculative. The following excerpts from the record bear upon Nank's veracity:

> "Answer: She drove the pickup through the driveway and over down within maybe five feet of the bike. I then tipped the motorcycle right side up and I proceeded to fill the gas tank up. I lied to her. This is going back to the crime and I was always trying to make up stories. You know.
>
> ". . .
>
> "Question: Did you tell them the same thing that you have told the jury here in the last two days?
>
> "Answer: No, I lied to Mr. Brake.
>
> "Question: In what respect did you lie to Mr. Brake?
>
> "Answer: I lied. I told Mr. Brake that Dewey tied Peggy Harstad up and I told him that Dewey undressed her instead of me.
>
> ". . .
>
> "Question: So that any statement in any record that you took LSD 25 or 30 times would be a lie?
>
> "Answer: It was in a lie in so much that maybe at that time I was going to try to use that as an excuse to be admitted for my crime into a state hospital instead of going to prison, and so that is maybe the reason that I made that statement, and I did lie because I heard of cases like this before, so I may have lied, yes.
>
> "Question: So now you did tell somebody that you had used LSD 25 or 30 times, but even though you lied about it, you thought you might be able to get off or get into a state hospital or something, is that right?
>
> "That would be the purpose of it, yes.
>
> ". . .
>
> "Question: Well, did you give them any examples of any aggressive behavior on your part?
>
> "Answer: I don't know, I did a lot of lying so I cannot state nothing truthfully about what I said there and get a correct answer. . . ."
> (Trial Transcript Vol. V, pp. 1056, 1057, 1102, 1103, 1130.)

Nank's testimony on the stand was also contrary to the testimony of law enforcement officers. Nank testified that he was telling the truth and the law enforcement officers were lying. One of the law enforcement officers who originally interrogated Nank following his arrest in Boise, Idaho, stated that Nank told him he became upset with Peggy Harstad because she said something to hurt his ego. Nank, during the Coleman trial, accused the law enforcement officer of lying about this matter. The following excerpt is taken from the transcript:

"Question: And do you recall that he said, 'I bet you that she probably said something to you that either hurt your ego, made you very mad, extremely upset', or something like that, and did you drop your head and not make any comment to that question?

"Answer: I did not make any comment because I knew that he was trying to make me make some kind of a statement.

"Question: And then he said, 'Did she say something to infuriate you or hurt your ego', or this type of thing, and you said, 'Yes, Yes, she did.'

"Answer: No, I never did say that. Mr. Brake lied and I also told Judge Martin when I was in an earlier court hearing before about that.

"Question: Mr. Brake lied?

"Answer: Mr. Brake did lie." (Trial Transcript Vol. V, p. 1091, 1092.)

Law enforcement officer Brake had also testified that at the time Nank and Coleman were arrested in their apartment in Boise, that Nank told the police to "Get your ass out of here". Nank, during the Coleman trial, again accused the law enforcement officers of lying. The following excerpt is taken from the record.

"Question: And did you when you were arrested tell the Boise police, to 'Get your ass out of here'?

"Answer: No. Mr. Brake lied about that, and I also tried to explain that to Judge Martin in an earlier court hearing that I said that Mr. Brake lied. That's one thing, I have never--I have never

called a policeman a name. He lied about that too." (Trial Transcript Vol. V, p. 1227.)

Again, officer Brake testified that he read the constitutional rights to Nank at the time of his arrest. Nank, while testifying during the Coleman case, disputed this. Nank testified:

"Question: Did he verbally--did Mr. Brake verbally advise you of your rights as soon as you were placed under arrest?

"Answer: Not at that time. Not at that particular time, no.

"Question: You heard Mr. Brake say that he did advise you of your rights, and that's a lie according to you?

"Answer: He did not at that time when we were arrested verbally advise us of our rights at that time, no, he did not.

"Question: You heard him testify that he did?

"Answer: He did not do it.

"Question: Well then, he lied?

"Answer: He lied." (Trial Transcript Vol. V, p. 1227.)

Nank's testimony itself was riddled with inconsistency. Though the record is replete with examples, the following is illustrative. When testifying about who undressed the victim, Nank gave the following testimony:

"Question: You took her shoes off didn't you?

"Answer: Yes, I did.

"Question: You undressed her?

"Answer: Dewey did." (Trial Transcript Vol. V, p. 1189.)

The following testimony is taken from page 1210, Vol. V, of the trial transcript.

"Question: And did you undress her?

"Answer: Yes I did.

"Question: And did you dress her up again?

"Answer: Yes I did."

-34-

And from page 1223 and 1224, Vol. V, of the trial transcripts, the following testimony is taken:

"Question: Do I understand that Dewey never took her clothes off?

"Answer: Dewey did not take her clothes off.

"Question: Do I understand that you took her clothes off?

"Answer: I did take her clothes off.

"Question: And that included her pants?

"Answer: She had on--well, some kind of moreless trousers or whatever.

"Question: Did that include underpants?

"Answer: I do not remember if she was wearing underwear at that time or not.

"Question: Did you put her clothes back on?

"Answer: I put her blue jeans back on. I think with what she was wearing, I put them back on, yes.

"Question: So that you were the only one that dressed or undressed her, is that correct?

"Answer: Yes, that's correct."

In the first statement Nank gave to law enforcement officials he said Coleman undressed the victim. On the stand Nank testified that Coleman undressed the victim and then changed the testimony and testified that he was the only one who had undressed the victim. His testimony, to say the least, was incredible.

Nank had a history of violence beginning with his childhood. Though the records show that he attacked his mother with a butcher knife, he testified that it was his mother who attacked him with the knife. Nank related the following testimony during the course of Coleman's trial:

"Question: Now you stated that your mother, Mrs. Nank--Mary, was that her first name?

"Answer: Margaret.

-35-

"Question: Margaret. At one time when you were 18 years of age, held a butcher knife at your throat and chased you around the house with a poker beating you upon the head and shoulders and then tearing the front of her dress and going out in the street and telling other people that you had attacked her sexually; did she do that?

"Answer: No, you stated that wrong, sir.

"Question: Well, did she hold a butcher knife at your throat?

"Answer: Yes, she did.

"Question: And did she chase you around the house with a poker?

"Answer: Yes, she did.

"Question: Did she hit you about the head and shoulders with a poker?

"Answer: Yes, she did.

"Question: Did she tear the front of her dress?

"Answer: The front of her blouse.

"Question: And did she tell other people that you had attacked her sexually?

"Answer: No, she did not.

"Question: She did not?

"Answer: She did not run out in the street and holler at people, no, she did not.

"Question: Did she tell other people that you had attacked her sexually?

"Answer: I think she might have told a doctor. I do not know." (Trial Transcript Vol. V, pp. 1074, 1075.)

Though the records show that Nank had attacked his mother with a butcher knife and indicate that he may have attacked her sexually, he took the witness stand in the Coleman case and said that his mother in fact had been the aggressor and he the victim.

Nank had been institutionalized in mental hospitals on four previous occasions. He had a history of violence including violence against both his mother and his sister. He had a felony record.

On the other hand, Coleman had no history of violence and no felony record. Coleman was a homosexual.

A psychologist testified with respect to a rapist's typical characteristics. This testimony showed that Nank fit the pattern but Coleman did not. In fact, this witness testified that the incidents of homosexuals being involved in rape was "practically zero".

In my nineteen years at the bench and bar I have seldom been so deeply disturbed by the injustice of a result. A defendant is here sentenced to die where there is practically no credible evidence connecting the defendant to the commission of the crime. There are strong reasons to believe that the defendant did not commit the crime for which the death penalty was imposed. And yet this Court is authorizing the imposition of that irrevocable sanction. I implore the federal courts to examine this record, and upon finding it to be as wanting as I do, to intervene and prevent this gross injustice.

_____
                Justice

Mr. Justice Daniel J. Shea dissenting:

Although the death penalty should be vacated in any event, I would also reverse the convictions for the reasons stated in my dissent, and for the reasons stated in the dissent of Justice Frank B. Morrison. Although dismissal is the proper ruling, even in the event of a failure to dismiss, the evidence of corroboration of accomplice Nank's testimony is so thin that a death penalty should not be imposed. I also join Justice Morrison in his dissent relating to imposition of the death penalty.

With the exception of parts I, II, III and a portion of part IV of the majority opinion, the opinion decides the issues in such a wholesale and summary manner that we have ourselves denied Coleman the due process to which he is entitled. The opinion fails to mention, let alone discuss, the issues raised in Coleman's final attempt to get justice in the state court system. How does one write a dissent to such a nonopinion? How does one know where to begin?

In part III of the opinion, the majority holds that post-conviction relief is available to a defendant sentenced to death, and with this I wholeheartedly agree. It would be unthinkable that either the legislature or this Court would or could foreclose the availability of relief. Unfortunately, however, the rest of the holding seems to give carte blanche to a district court to deny any and all applications for post-conviction relief, and that decision will be automatically affirmed by this Court by our refusal to even state or discuss the issues. The District Court's treatment of Coleman's application for post-conviction relief is appalling, and this Court's handling of Coleman's appeal from that order is even more appalling.

-38-

In the normal case, I would agree with part II of the majority's opinion that the trial judge and the sentencing judge should also preside over an application for post-conviction relief. But that general rule must give way to a situation where one under a death penalty is seeking post-conviction relief. For reasons which I state in detail in part III of my dissent, the post-conviction relief judge here should have called in another judge to preside over Coleman's application for post-conviction relief. His failure to do so made a mockery of any meaningful consideration of the claims presented to the court. Minimally, this Court should have ordered a new hearing before another district judge.

I agree, however, with part I of the majority opinion in its conclusion that post-conviction relief is essentially a new civil action. And even though it is somewhat illogical to hold that the judge who presided over the criminal case also should preside over the application of post-conviction relief, there are sound reasons, except in a death penalty case, for the same judge presiding over both proceedings.

Finally, I agree with a part of the majority opinion in part IV--that part of the opinion holding that res judicata may be applied to a petition for post-conviction relief if the criteria of Sanders v. United States (1963), 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148, are followed in making this decision. But the majority has, in the remainder of part IV, and in other parts of the opinion, totally negated those very criteria set out in Sanders, by its wholesale and summary treatment of the issues.

United States v. Sanders is concerned with the extent a federal court in a post-conviction relief proceeding such as

habeas corpus, can give controlling weight to a previous denial of habeas corpus. Although it is procedurally inapplicable to the case before us, nonetheless <u>Sanders</u> does adopt sound and workable standards that can apply to a petition for post-conviction relief after there has been a direct appeal. But the majority here has failed to recognize that we must consider each criteria before we can justly say that res judicata should bar the claim. This Court must decide first that the same ground was presented at another proceeding and determined adversely. Second, this Court must then determine whether the previous decision was on the merits. And third, this Court must decide whether the ends of justice require that we again reexamine the issue. By this third criteria, the Court can refuse to apply res judicata even if the issue has been previously decided on the merits--if the ends of justice require it.

The majority here has failed miserably in applying these criteria, for there is no way of determining from the opinion how or if the criteria were applied. So much for <u>Sanders</u>.

I have divided my dissent into eight parts, and they are at best arbitrarily divided. But these divisions do give some semblance or order to the presentation of my views concerning this appeal. This case on appeal was aided neither by Coleman's brief nor by his counsel's arguments at the hearing. When this situation occurs, the situation is, of course, complicated even more. Coleman raised in the trial court and before this Court 52 issues. Counsel lettered the issues A through Z, and then started again at the beginning of the alphabet and went through the alphabet once more, lettering the issues AA through ZZ--52 issues. Needless to say, it is more than a little difficult for any appellate

court to concern itself with 52 issues on appeal. That process is complicated even more when the briefs and oral arguments are so poor.

I have chosen to concentrate on those issues which I believe to have most merit. This is not to say that I believe at least some of the other issues not to have merit, but time constraints require me to concentrate on those issues I feel are most worthy of discussion.

This dissent is divided into eight parts, divided as follows: Part I, Improper Empanelling of Jury Panel; Part II, Unanimous Jury Verdict Requirement; Part III, Recusal of Sentencing Judge; Part IV, Retroactive Application of Death Penalty Statutes; Part V, Unconstitutional Shifting of Burden of Proof to Defendant; Part VI, Right to Jury Trial on Question Whether Death Penalty Should be Imposed; Part VII, Right to Evidentiary Hearing on Question of Whether Death by Hanging Constitutes Cruel and Unusual Punishment; Part VIII, Denial of Meaningful Appellate Review.

Because the majority opinion has totally failed to mention the issues, other than to refer to them by the letters as designated in the petition for post-conviction relief and in the appeal, I append the trial court's order to this dissent as Exhibit A. The order disposes of each of the issues raised, although at times it is difficult to determine exactly what issue was decided. I _further_ _emphasize_ _that_ _this_ _order_ _is_ _a_ _word-for-word_ _adoption_ _of_ _the_ _proposed_ _findings_ _and_ _conclusions_ _of_ _law_ _presented_ _by_ _the_ _State_. For this reason, it can hardly be considered as being the careful analysis of a trial judge judiciously carrying out his duties.

I dissented in both Coleman I (1978), 177 Mont. 1, 39 to 43, 579 P.2d 732, 754 to 756, and Coleman II (1979), ___ Mont. ___,

-41-

605 P.2d 1000, 1022 to 1051, 36 St.Rep. 2237, 2248 to 2249, and I still adhere to those views. On some of these issues, however, I do expand more on my views in this dissent.

PART I

IMPROPER EMPANELLING OF JURY PANEL.

By Issue F, covered in the omnibus holding of the majority opinion in Part IV, the defendant claims he was deprived of his right to have a jury that was properly selected and empanelled. In Coleman I, 579 P.2d 732, the majority held against him. I dissented on this issue, 579 P.2d 754-756, and for this reason alone, I would grant defendant a new trial.

The majority has cut real corners and did not reach the real issue in deciding this issue in Coleman I, and for this reason, I would again review it by application of the Sanders criteria. It seems that all the majority is concerned about is whether there were 12 jurors present to try the case and not how the 12 jurors happened to be there in the first place. In my dissent, I pointed out the improper procedures used in calling in the panel of jurors, of which at least some of the 12 jurors were called in the manner described.

PART II

THERE IS NEITHER ASSURANCE THAT THE JURY REACHED A UNANIMOUS VERDICT ON ONE OR MORE THEORIES OF CRIMINAL RESPONSIBILITY SUBMITTED TO THE JURY, NOR ARE ALL THEORIES SUPPORTED BY SUBSTANTIAL EVIDENCE

Issue UU, an issue not raised in Coleman's first two appeals, claims that all three convictions must be reversed because there is no assurance that the jury reached unanimous agreement on one or more of the alternative theories of criminal responsibility submitted to the jury on each charge. Without this assurance, Coleman claims that he has been denied his right to unanimous jury verdict as guaranteed by the

-42-

Sixth and Fourteenth Amendment of the United States Constitution, and as guaranteed by Article II, § 26, Montana Constitution.

Counsel has raised this issue without a genuine attempt to analyze the issue and apply it to this case. The same issue has been raised in the Fitzpatrick and McKenzie cases now before this Court, and undoubtedly Coleman's counsel has been the recipient of some cross-fertilization. I believe, nonetheless, that Coleman has raised an issue deserving of careful review by this Court, and that Coleman's convictions should be reversed because there is no assurance that the jury reached unanimity on a single theory of statutory responsibility.

My position is not based on the fact that this is a death penalty cause; the issue is a serious one even if the death penalty were not the underlying issue. But the fact that Coleman has been sentenced to hang requires all courts, and especially this Court, to carefully consider the merits of this claim. But the trial court and this Court have failed miserably in treating the issue as virtually frivolous.

The United States Supreme Court, in the aftermath of its decision upholding the constitutionality of the death penalty, has emphasized the need to be sure not only that the death penalty is the properly penalty, but that the guilt finding process has been scrupulously adhered to. In Beck v. Alabama (1980), 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392, the Supreme Court stated:

> "To insure that the death penalty is . . . imposed on the basis of 'reason rather than caprice or emotion,' (the courts) have invalidated procedural rules that tended to diminish the reliability of the sentencing determination. The same reasoning must apply to rules that diminish the reliability of the guilt determination." (Emphasis added.)

And the Supreme Court has long recognized that the question of whether a verdict was unanimous in a death penalty case must not be left to guesswork.

-43-

In Andres v. United States (1948), 333 U.S. 740, 68 S.Ct. 880, 92 L.Ed. 1055, the trial court failed to instruct the jury that it must be unanimous as to both guilt and as to a sentence recommendation. Under the statute involved, a conviction required the death penalty to be imposed unless the jury directly stated in its verdict that it should not be imposed. The court held that where a statute requires jury input on sentencing, unanimity is required, and the jury had not been expressly instructed that it must also reach unanimity as to whether it made no recommendation (thereby triggering mandatory imposition of the death penalty), or whether it made a recommendation that the death penalty not be imposed. Because there was no assurance that the jury knew of the unanimity requirement with respect to sentencing, the Supreme Court reversed, stating: "In death cases, doubts such as these presented here [doubts as to unanimity] should be resolved in favor of the accused." 333 U.S. at 752.

In the third McKenzie case, State v. McKenzie (1979), _____ Mont. _____, 608 P.2d 425, 474, 36 St.Rep. 2157, in discussing the impact of the unconstitutional Sandstrom-type jury instructions on the jury verdicts, I raised the added spector that McKenzie may also have been the victim of less than unanimous jury verdicts because of the many alternative charges to the jury, and because of the failure of the verdicts returned to specify the underlying basis for the conviction. I cited and quoted from United States v. Gipson 5th Cir. (1977), 553 F.2d 453, 457-458, which held that: "[r]equiring the vote of twelve jurors to convict a defendant does little to insure that his right to a unanimous verdict is protected unless this prerequisite of jury concensus as to the defendant's course of action is also required."

-44-

The spector of a nonunanimous verdict in a death penalty case has now been raised here.

Coleman was charged with three distinct crimes: count I, deliberate homicide; count II, aggravated kidnapping; and count III, sexual intercourse without consent. For each of these crimes charged, the jury was instructed that it could reach a verdict based on several alternative theories of criminal responsibility. Under count I, the jury was instructed it could find Coleman guilty of deliberate homicide by use of the felony-murder rule, or by finding that he purposely and knowingly killed Lana Harding. But under the felony-murder rule the jury was given the choice of several felonies, including unspecified felonies, to apply in determining whether Coleman was guilty of felony-murder. Under count II, aggravated kidnapping (which conviction triggered the death penalty here) the jury was given several choices of what felony Coleman had in mind to commit when he held or secreted Lana Harding. Furthermore, several of these choices are unsupported by substantial evidence. Under count III, sexual intercourse without consent, the jury was given two choices as to proof of the issue of "without consent." One of those choices is unsupported by substantial evidence.

The trial court gave the jury only a general instruction on unanimity, applicable to all three charges, which stated that ". . . such verdict must be unanimous, which means that all of you must agree on the verdicts." The trial court failed, however, to instruct the jury that its verdict on each charge must be unanimous on one or more of the theories of criminal responsibility. The verdict forms given to the jury by the trial court, provide no basis to determine the

-45-

underlying statutory theory or theories applied by the jury in finding Coleman guilty.

The jury returned guilty verdicts on all three charges, but the verdicts specified only that Coleman was guilty of count I, deliberate homicide; that he was guilty of count II, aggravated kidnapping; and that he was guilty of count III, sexual intercourse without consent. It is impossible to determine from these verdicts whether the jury was unanimous on one or more theories of criminal responsibility for an essential element of the crime. In addition, at least one theory of "without consent" submitted to the jury on the charge of sexual intercourse without consent (count III) is unsupported by substantial evidence. But more important, several theories submitted to the jury on the charge of aggravated kidnapping (count II) are not supported by substantial evidence. It remains for those more knowledgeable than me to explain how any appellate court can approve the death penalty for the conviction of aggravated kidnapping even though several theories of criminal responsibility as charged in that offense, are not supported by substantial evidence.

Both the trial court and the majority have sloughed off this issue as essentially frivolous.

In adopting verbatim the State's proposed finding or conclusion, the trial court ruled:

> "UU. Petitioner contends that he was denied his right to a unanimous jury verdict. But when the instructions are read as a whole, as they must under Coleman II, 605 P.2d at 1052, the claim fails. See Cupp v. Naughton, 414 U.S. 141, 147. In addition, petitioner's reliance on the federal constitution is misplaced in that the federal constitution does not guarantee the right to a unanimous jury verdict in state felony jury trials. Apodoca v. Oregon, 404 U.S. 404 (1972); Johnson v. Louisiana, 404 U.S. 356 (1972)."

-46-

This ruling treats the issue in a most summary fashion, evading rather than meeting the question raised. But the majority opinion is even worse, for it fails even to identify the issue, let alone to analyze the issue with respect to the procedural context of the charges, the instructions, and the verdicts returned. The majority disposes of this claim by another omnibus ruling in Part VII of its opinion, disposing of this and four more issues:

> ". . . Because the post-conviction procedure is a new civil remedy, the failure to present claims in earlier proceedings would not bar them from presentation at this time. However, we have reviewed the claims and find the same to be unmeritorious. It was not error for the court to deny them summarily . . ."

The trial court's reliance on Johnson v. Louisiana (1972), 404 U.S. 356, and Apodoca v. Oregon (1972), 404 U.S. 404, is misplaced. It is true that both cases hold that a state court is not required by the Sixth and Fourteenth Amendments to guarantee a unanimous jury verdict. But this holding ignores the fact that Montana's Constitution, Art. II, § 26 ("In all criminal actions, the verdict shall be unanimous"), guarantees a unanimous verdict to all defendants charged in state court, whether it be a felony or even a misdemeanor. In light of our own constitution, the United States Supreme Court would clearly not permit this Court to sanction a death penalty conviction where the verdict may have been less than unanimous. If we did not assure that Coleman had unanimous jury verdicts, we would, in effect, deny him equal protection of law. And that is a federal question.

This Court cannot, without denying equal protection of the law, distinguish between a situation where a defendant is charged with one crime and one statutory theory of criminal

responsibility, and a situation where a defendant is charged with one or several crimes, but where he is also charged with multiple statutory theories of criminal responsibility. In the first situation, a general instruction on unanimity, in addition to a guilty verdict returned on the only charge and only statutory theory of responsibility for that charge, would assure unanimity. But that is not so in the second situation where a defendant is charged with three crimes, but also charged with committing those crimes in several alternative ways. In this situation, a general instruction as to unanimity will not suffice. Rather, the jury must be instructed that its verdict must be unanimous on any one or more statutory theories applied in reaching its verdict. Further, the verdicts returned should disclose the statutory basis on which the jury reached its verdict. If these requirements are not fulfilled, a defendant charged in such a situation is deprived of equal protection of the law. This situation is especially grievous, where, as here, the defendant has been sentenced to death.

THE UNANIMOUS VERDICT REQUIREMENT IN THE CONTEXT OF THE CHARGES FILED:  FAILURE OF THE STATE TO FOLLOW STATUTORY PROCEDURES

First, we must recognize that in charging Coleman by alleging several statutory theories for the same offense, the State failed to follow proper statutory guidelines. If it had done so, the problems we face here would not exist. The applicable statute, section 46-11-404, MCA, clearly sets out the procedure for the filing of alternative charges, that is, ". . . different versions of the same offense." Section 46-11-404(1), MCA, states in relevant part:

> "(1)  An indictment, information, or complaint
> may charge two or more different offenses
> connected together in their commission, different
> statements of the same offense, or two or more

-48-

different offenses of the same class <u>under</u>
<u>separate</u> <u>counts</u>.. . . The prosecution is not
required to elect between the different offenses
or counts set forth in the indictment, information
or complaint, and the defendant may be convicted
of any number of the offenses charged. <u>Each</u> <u>offense</u>
<u>of</u> <u>which</u> <u>the</u> <u>defendant</u> <u>is</u> <u>convicted</u> <u>must</u> <u>be</u> <u>stated</u>
<u>in</u> <u>the</u> <u>verdict</u> <u>or</u> <u>the</u> <u>finding</u> <u>of</u> <u>the</u> <u>court</u>."
(Emphasis added.)

Although the statute uses the word "may", the message

is that the prosecutor should charge in the manner stated

in order to avoid problems such as exist in this case. The

prosecutor did charge three separate crimes, and this statute

permits him to do so. But the statute also states that if

"two or more statements of the same offense" are charged, that

it be done so "<u>under</u> <u>separate</u> <u>counts</u>." If that had been done

here, the jury could have returned a verdict on each of the

separate counts, and therefore the basis for its decision

would be specified. The statute also clearly contemplates

this procedure by stating that the prosecutor is not required

to elect on his theories, but that "each offense of which the

defendant is convicted <u>must</u> <u>be</u> <u>stated</u> <u>in</u> <u>the</u> <u>verdict</u> . . ."

I read this last sentence to mean, in context with the

entire subsection, that if a defendant is charged in separate

counts with a different statement of the same offense, a

verdict form must be prepared for that separate statement,

and the jury must return a verdict on that particular state-

ment of the offense. If this procedure had been followed in

this case, we would know the precise basis on which the jury

reached its verdict on each charge. It is the State then,

who must assume the responsibility for improperly charging

Coleman and for setting in motion the ambiguous verdicts.

The State's error in not following this statute, is

magnified by the failure of the trial court to instruct the

jury that its verdict must be unanimous on each statutory

-49-

theory of criminal responsibility presented to it by the instructions. Again, that fault must be laid to the State and to the trial court. Furthermore, the trial court provided the ambiguous verdicts for the jurys' case.

I proceed next to a discussion of the general law in relation to the requirement of a unanimous jury verdict, and then I will discuss the charges, the jury instructions, and the verdicts returned in this case.

## DETERMINING JURY UNANIMITY WHERE STATUTORY THEORIES OF THE CRIMES ARE CHARGED ALTERNATIVELY IN THE SAME COUNT

If only one crime is charged in one count, and if only one statutory theory of that crime is pleaded, the unanimity requirement normally presents no problem. It is sufficient to instruct the jury that it must reach a unanimous verdict. But the problem is entirely different where a defendant is charged with one crime in one count, but where in the same count, he is charged with committing that crime alternatively in several different ways.

For example, if a defendant is charged with aggravated kidnapping with a purpose to commit the felony of sexual intercourse without consent, or the felony of aggravated assault, it is not sufficient if six jurors believe that the defendant kidnapped the woman for the purpose of sexual intercourse without consent, and the six other jurors believe that the defendant kidnapped the woman for the purpose of committing aggravated assault upon her. If a jury returns a verdict on this basis, they are not in unanimous agreement, and the verdict cannot stand. In this situation, it is not a question of whether substantial evidence supports both theories, it is a question of whether the jury unanimously agreed to at least one theory. It is up to the jury to reach

unanimity and the function of the appellate court is to determine if the jury in fact reached unanimity.

DETERMINING JURY UNANIMITY--FUNCTION OF APPELLATE COURT

The appellate court, of course, cannot read the jurys' mind, and so review necessarily involves an examination of the charges filed, the instructions given defining the elements of those charges, the instructions given with regard to the requirement of unanimity, and the verdicts actually returned by the jury. Obviously, if the verdict specifies the theory used by the jury in finding guilt, no problem is presented. It is then only a question of examining the evidence to determine if the theory used is supported by the evidence. The question, therefore, nearly always arises where the verdict form is ambiguous and only the jurors know what was actually decided.

Ambiguous jury verdicts in criminal cases are frequently the result of a failure to properly charge a crime or crimes, and of a failure to give the jury proper instructions and verdict forms. For example, if a defendant is charged in count I with two or more crimes, what does a jury verdict reveal where it finds that defendant is guilty of count I? Did the jury convict the defendant of one crime or both? Was the jury unanimous with respect to either? United States v. Starks (3rd Cir. 1975), 515 F.2d 112, 116-117. Also see, United States v. Uco Oil Co. (9th Cir. 1976), 546 F.2d 833, 835, cert.den. (1977), 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357. And, of course, the same questions can be asked, although in a slightly different context, if a defendant is charged in count I with one crime, but where several alternative theories are also alleged in that count. If the jury returns a guilty verdict to count I, the questions arise as to whether the jury convicted defendant under one

-51-

alternative theory, or more than one alternative theory, or under all alternative theories. In addition, the question arises aso to whether the jury reached unanimous agreement on at least one theory? No one knows.

One of the first questions is to determine how the jury was instructed on the question of unanimity. Some courts have held that a general instruction on unanimity is sufficient. For example, see, State v. Arndt (1976), 87 Wash.2d 374, 553 P.2d 1328; United States v. Natelli (2nd Cir. 1975), 527 F.2d 311; State v. Williams (Iowa 1979), 285 N.W.2d 248; State v. Souhrada (1948), 122 Mont. 377, 204 P.2d 792. On the other hand, other courts have held that a general instruction is not sufficient; rather, the jury must be specifically instructed that it must reach unanimous agreement on any one or more statutory theories of criminal responsibility as charged by the State.

The defect of a general instruction has been pointed out in United States v. Gipson, supra:

> "The unanimity rule thus requires jurors to be in substantial agreement as to just what a defendant did as a step preliminary to determining whether the defendant is guilty of the crime charged. Requiring the vote of twelve jurors to convict a defendant does little to insure that his right to a unanimous verdict is protected unless this prerequisite of jury concensus as to the defendant's course of action is also required." 553 F.2d at 457-458.

Implicit in this ruling is a requirement that the trial court instruct the jury that it must reach unanimity on any theory used as a basis to find guilt.

Several state courts have held that a jury must be instructed that its verdict be unanimous on one or more of the alternative theories submitted to the jury for its decision. See, for example, State v. Bleazard (1943), 103 Utah 113, 133 P.2d 1000, 1003; People v. Thompson (1956), 144 Cal.App.

2d 854, 301 P.2d 313. And more recently, in cases involving the alternative theories of premeditated murder and felony-murder, Michigan and Washington have held that the jury must be instructed that its verdict be unanimous on at least one of the theories. State v. Golliday (1979), 78 Wash.2d 121, 137, 470 P.2d 191, 201; People v. Embree (1976), 68 Mich.App. 40, 241 N.W.2d 733; People v. Olsson (1974), 56 Mich.App. 500, 507, 224 N.E.2d 691, 693-694.

In Olsson, the Michigan Court of Appeals reversed a conviction because jury instructions failed to distinguish between felony murder and premeditated murder, and because the jury was not instructed that it must unanimously agree on the same statutory theory in order to reach a verdict. 224 N.W.2d 693-694. And in Embree, the Michigan Court of Appeals again warned trial courts that they must instruct juries that their verdict must be unanimous on the question of whether the alleged murder was premeditated or whether it was committed in a situation calling for application of the felony-murder rule. 68 Mich.App. 384, 246 N.W.2d at 7. Finally, in Golliday, the Washington Supreme Court held that "instructions must clearly distinguish between the alternative theories and require the necessity for a unanimous verdict on either of the alternatives. 470 P.2d at 201.

As I shall later demonstrate in detail, each of the charges involved here was based on alternative allegations. Yet the jury was not told that its verdict must be unanimous as to any one or more theories. In addition, there is no way of telling which theory or theories the jury used to convict Coleman of all three offenses--one of which triggered the imposition of the death penalty.

WHY THE CONVICTIONS MUST BE REVERSED

Those decisions holding a general unanimity instruction to be sufficient, fail to go beyond this general statement. They ignore the actual doubt that inheres in such a position. Further, they ignore the fact that it is a defect in the judicial system that has created the problem; it is not a problem created by the defendant. The defect can be charged to the State in failing to properly charge the defendant in separate counts, the defect can be charged to the trial court in failing to instruct the jury that its verdict must be unanimous as to any statutory theory or theories of criminal responsibility, and the defect can be charged to the trial court in failing to provide clear verdict forms. Because these decisions ignore these failures in the judicial system, and assume unanimity, analysis is confined solely to reviewing the sufficiency of the evidence to support each theory submitted to the jury.

Obviously, if the theory of criminal responsibility is clear, and the verdict is clear, review can then center on the sufficiency of the evidence. If the appellate court can state that the jury applied a particular theory or theories in reaching its decision, the court can then confine itself to examining the evidence to determine its sufficiency. If it is sufficient, it can be affirmed; if not, the conviction must be reversed.

But what does the appellate court do if the verdict fails to disclose the statutory theory on which the jury based its decision? An analysis of all theories to determine their sufficiency clearly proceeds on the assumption that whatever theory or theories the jury used, the jury was unanimous. Without this assumption of unanimity, the conviction would be reversed precisely because of the inability of the court to say that the jury verdict was unanimous.

But an assumption of unanimity should never be made in a case such as the one involved here, unless the jury has been specifically instructed that it must be unanimous on any statutory theory or theories on which the State has based its prosecution. Failure to give this instruction is cause for reversal. In this event, appellate review would then be confined to determining whether all theories are supported by substantial evidence. If all were so supported, the judgment would be reversed and a new trial ordered under all theories. If not so supported, the case would be reversed with retrial only on those theories supported by substantial evidence.

Where the appellate court rests on an assumption of unanimity, however, reversal is required only if all theories are not supported by substantial evidence. But the reason for reversal is not that the jury was less than unanimous on a theory or theory on which it based its conviction, for unanimity is assumed. Rather, the reason for reversal is that the jury may have been unanimous on a theory not supported by the evidence. Uncertainty as to the theory used is the reason for reversal. This rationale is much the same as that used to reverse a jury verdict where the jury is given inconsistent instructions on an important point of law. Reversal is based on a fundamental policy rule that if the appellate court cannot tell whether the jury followed the correct or incorrect instruction, and it would be unfair to affirm a verdict based on an erroneous instruction. See, for example, my dissent in State v. Price (1980), ____ Mont. ___, 622 P.2d 160, 37 St.Rep. 1926, where I thoroughly developed this theory of appellate review. The impelling reason for reversal in both situations is uncertainty as to what the jury did where it may have followed an evidentiary

-55-

theory not supported by the evidence, or an erroneous instruction, and therefore uncertainty is created as to whether a correct verdict was reached.

Where several alternative theories of criminal responsibility are presented to the jury, and where the verdict is ambiguous as to which theory or theories were applied, review of necessity rests on an implicit recognition that no one knows what theory the jury actually followed in reaching its verdict. If the jury had been instructed, however, that it must be unanimous on any theory applied to reach a decision, then an appellate court should assume that the jury was in fact unanimous. But where there is no such instruction, the appellate court should not make this assumption. The question boils down to one of policy--how much leeway can a jury be permitted in reaching its decision? If due consideration is given to the fact that a defendant's liberty or even his life is at stake, that policy should come down on the side of reversal.

In a case such as this, a general unanimity instruction should not enshrine the verdict with unanimity. Either an assumption that the jury reached unanimous agreement, or an assumption that the jury did not reach unanimous agreement, without further analysis, fails to deal with the basic problem. An assumption either way still rests on an implicit recognition that the appellate court cannot tell how the jury actually decided the case. In addition to the actual uncertainty resulting from the ambiguous verdict, reversal should also be mandated because the State, not the defendant, caused the problem. The defendant should not suffer from a defect of the judicial system.

In charging alternatively in one count rather than charging alternatively in separate counts (see section 46-11-404

MCA, supra) the State initiated the problem of ambiguity.
The trial court then compounded the ambiguity by failing to
instruct the jury that its verdict must be unanimous on one
or more of the alternative theories of criminal responsibility
as alleged by the State. And finally, the trial court added
again to the problem by submitting to the jury the ambiguous
verdict forms. Doubt surely inheres in this situation. This
situation was created by the State (the prosecution and the
court) and the benefit of this doubt should be given to the
defendant. United States v. Andres, supra. In any criminal
case, fundamental due process impels a reversal; in a death
penalty case such as this fundamental due process mandates
a reversal.

ANALYSIS OF THE CHARGES FILED, THE INSTRUCTIONS GIVEN, AND
THE VERDICTS RETURNED IN THIS CASE

The formal charge for each count, the instructions
for each count, and the verdict forms for each count, present
essentially the same problems. The instructions for count
I, the deliberate homicide charge, for count II, the aggravated
kidnapping charge, and for count III, the sexual intercourse
without consent charge, respectively gave the jury several
alternative statutory theories on which the jury could base
its verdict. The jury was given a general unanimity instruction
designed to apply to all three counts. But the jury was not
instructed that it must unanimously agree to any one or more
of the alternative statutory theories. Furthermore, the verdict
forms required nothing more than a determination that the
defendant was guilty or not guilty of deliberate homicide,
guilty or not guilty of aggravated kidnapping, and guilty or
not guilty of sexual intercourse without consent.

The general instruction on unanimity (instruction no. 41)
stated:

-57-

"You are instructed that when you retire, you
are to elect one of your members as foreman
who will sign any verdicts arrived at by the
jury.

"Such verdicts must be unanimous, which means
that all of you must agree on the verdicts.
Verdict forms will be provided for your con-
venience.

"When you have reached your verdicts, you
will notify the bailiff who will return you
into court." (Emphasis added.)

I next proceed to discuss each of the separate charges.

COUNT I: THE DELIBERATE HOMICIDE CHARGE, JURY INSTRUCTIONS
AND VERDICT

The prosecutor used the following language in the formal

charge of deliberate homicide (count I):

"That the defendant purposely and knowingly caused
the death of another human being, to-wit: Peggy
Lee Harstad, while engaged in the commission of
the following felonies: Kidnapping and Sexual
Intercourse Without Consent, involving the use
of physical force and violence against the said
Peggy Lee Harstad."

This charge, unequivocally in the conjunctive, required

that the prosecutor prove each of the following facts:

1. That Coleman deliberately and knowingly caused the

death of Peggy Lee Harstad; and

2. That he did so while he was engaged in the commission

of both kidnapping and sexual intercourse without consent;

and

3. That while engaged in the commission of these

crimes Coleman used physical force to accomplish them.

As it turns out, however, the jury was not instructed

in the conjunctive language of the charge itself, but rather

was instructed that the jury could convict if it determined

either that Coleman knowingly or purposely killed the woman,

or that he did so while engaged in the commission of several

alternative applications of the felony-murder rule.

The jury was instructed in the exact language of count I, but was also instructed on the essential facts to be proved to sustain the charge of deliberate homicide. This instruction (instruction 27) unequivocally told the jury that it had a choice of several statutory theories of criminal responsibility on which to base its conviction:

"To sustain the charge of deliberate homicide, the State must prove the following propositions:

"First, that the defendant performed the acts causing the death of Peggy Harstad;

"Second, that when the defendant did so,

"(1)  He acted purposely or knowingly or

"(2)  That he was engaged in the commission of kidnapping or any other felony which involves the use or threat of physical force or violence against any individual.

"If you find from your consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt, then you should find the defendant guilty."  (Emphasis added.)

Under the second proposition to be proved, the jury had several choices in determining how the woman's death came about. First, the jury could determine that Coleman "purposely or knowingly" caused the woman's death. If so, the jury could convict Coleman of deliberate homicide. Second, the jury could convict Coleman of deliberate homicide if it found that he was engaged in the commission of kidnapping. Third, the jury could convict Coleman of deliberate homicide if it found that he was "engaged in the commission of . . . any other felony which involves the use or threat of physical force or violence against any individual."  (Emphasis added.)

Therefore, the jury could base a guilty verdict for the charge of deliberate homicide by concluding that Coleman "purposely or knowingly" caused the death of the woman, or by applying the felony-murder rule that Coleman caused the

-59-

woman's death while he was kidnapping her or while he was committing any other felony that involved using physical force or threatening to use physical force against the woman or any other person. The language "any other felony" provides a much wider range of possible felonies that the jury may have considered beyond that of kidnapping. The verdict returned by the jury, however, provides no basis from which one can determine which statutory theory or theories were used by the jury to convict.

The verdict form signed by the jury foreman states only that:

> "We, the jury, in the above-entitled cause find
> the defendant guilty of Deliberate Homicide as
> charged."

Did the jury decide without reference to the felony-murder rule that Coleman had purposely or knowingly killed the woman? Or did the jury decide that Coleman caused the woman's death while kidnapping her? Or did the jury decide that Coleman caused the woman's death while he was engaged in the commission of some other unspecified felony that involved the use of force or a threat to use force? Or did the jury base its verdict on more than one of these statutory theories of criminal responsibility? Finally, and most important, was the jury unanimous on at least one of these statutory theories of criminal responsibility when it returned its guilty verdict?

The trial court failed to instruct the jury that in order to convict Coleman for deliberate homicide, it must agree unanimously upon at least one of the alternative theories of criminal responsibility relied upon by the State. Gipson, supra and Green, supra, require that a jury be so instructed. The verdict does not establish whether the jury found that the defendant purposely or knowingly caused the woman's

-60-

death or whether it found the defendant guilty by application of the felony-murder rule. And the verdict does not indicate that the jury was in unanimous agreement that the defendant was criminally responsible under any one, specific theory. Based on my previous discussion of the unanimity requirement, the deliberate homicide conviction should not be permitted to stand. It must be reversed and a new trial ordered. Chapman v. California, supra; and see, United States v. Gipson, supra.

COUNT II: THE AGGRAVATED KIDNAPPING CHARGE, JURY INSTRUCTIONS AND VERDICT

The same situation occurs with count II, the charge of aggravated kidnapping, but here policy reasons also require reversing the conviction for the added reason that because of this conviction, Coleman was sentenced to death. Due to the zeal of the trial court in laying the foundation to enable it to impose the death penalty, the jury was required in its verdict to make a special finding that the woman met her death as a result of being kidnapped. Even assuming this to be a unanimous finding, it still cannot be upheld because of the defect in the underlying aggravated kidnapping conviction.

The prosecutor charged Coleman with count II, aggravated kidnapping, in the following language:

> "That the defendant knowingly or purposely and without lawful authority restrained another person, to-wit: Peggy Lee Harstad, by holding her in a place of isolation and by using physical force to facilitate the commission of a felony, to-wit: Sexual Intercourse Without Consent, and for the purpose of inflicting bodily injury on and terrorizing the said victim, Peggy Lee Harstad, resulting in the death of Peggy Lee Harstad." (Emphasis added.)

Just as the deliberate homicide charge was phrased in the conjunctive, so was the aggravated kidnapping charge

-61-

phrased in the conjunctive. This being so, the State was required
to prove each essential fact charged. However, the jury was
not instructed on this charge in the conjunctive, but was
instructed in the disjunctive. Instructions 37, 38 and 39 make
it abundantly clear that the jury was given several statutory
theories of criminal responsibility under which it could find
Coleman guilty of aggravated kidnapping.

Each of these instructions sets out a different list of
essential facts to be proved in order to sustain a conviction.
Such an inconsistency should not be permitted in any criminal
case, let alone in a death penalty case. Here, this inconsistency
is reason enough to reverse the conviction of aggravated
kidnapping. How does anyone know which of the inconsistent
instructions the jury followed in reaching its guilty verdict,
or whether, because of the inconsistencies, the jury followed
any of them at all?

In instruction 37, the trial court defined the crime
of aggravated kidnapping as follows:

> "A person commits the crime of aggravated
> kidnapping if he knowingly or purposely and
> without lawful authority restrains another person
> by secreting or holding her in a place of isolation
> with any of the following purposes:
>
> "(1)  to facilitate commission of any felony;
>
> "(2)  or to inflict bodily injury or to terrorize
> the victim."  (Emphasis added.)

In this instruction the jury was told that it could con-
vict if Coleman, in restraining the woman, had the purpose
to commit any felony, or if he had the purpose to inflict
bodily injury, or if he had the purpose to terrorize the woman.

Then, instruction no. 38 attempted to set out other
facts which the State was required to prove, according to
the actual charge filed against the defendant:

"The offense of Aggravated Kidnapping requires
that the voluntary act (the secreting or holding
of the victim without lawful authority in a place
of isolation, or the holding of said person by
physical force or threats thereof), be done either
knowingly or purposely, and in addition thereto,
that it be done for one of the following purposes:

"(a)  to facilitate the commission of any felony
(in this case sexual intercourse without consent
of the victim, or an aggravated assault upon the
victim), or

"(b)  to inflict bodily injury on the victim."
(Emphasis added.)

In this instruction, the jury was told that the State
had to prove these facts:  First, that Coleman held or
secreted the woman, and that he did so either without lawful
authority or by using physical force or threatening to use
physical force.  Second, that Coleman had one or more of the
following purposes when he held or secreted the woman:  (a)
the purpose to facilitate the commission of any felony
(here, limited to sexual intercourse without consent or
aggravated assault) or (b) the purpose to inflict bodily
injury upon the woman.  Assuming there is substantial evidence
to support each of these alternative theories, there is
still no way to tell whether the jury was unanimous in
applying any one theory.

Instruction no. 38 considerably expands the range of
alternatives set out in instruction no. 37.  But then instruction
no. 39 further muddies the waters by again setting out and
expanding the theories of criminal responsibility under
which Coleman was charged:

"To sustain the charge of aggravated kidnapping,
the state must prove the following propositions:

"First:  That the defendant knowingly or purposely
restrained Peggy Harstad by secreting her in a
place of isolation; and

"Second:  That the defendant had the purpose in
so acting to facilitate the commission of any
felony, or to inflict bodily injury, or to terrorize
Peggy Harstad.

-63-

"Third, that in so doing the defendant acted without lawful authority.

"If you find from your consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt, then you should find the defendant guilty.

"If, on the other hand, you find from your consideration of all the evidence that any of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant not guilty."  (Emphasis added.)

Instruction no. 39 differs considerably from instruction no. 37.   The jury was told that it could find Coleman guilty by finding that he had any one of three purposes in restraining or secreting the woman.  First, the jury could find Coleman guilty by finding he had the purpose to commit any felony.  Although instruction no. 37 also states any felony, instruction no. 39 considerably expands upon instruction 38, which limited the purpose to the commission of sexual intercourse without consent or aggravated assault.  Second, the jury could find Coleman guilty by finding his purpose was to inflict bodily injury upon her.  This prosecution theory is also stated in instructions no. 37 and 38, and therefore is not inconsistent.  Third, the jury could find Coleman guilty by finding his purpose in holding or secreting the woman was to terrorize her.  This language is consistent with instruction no. 37 but is not consistent with instruction no. 38.

Because these instructions are inconsistent, there is no way to determine which of the instructions the jury has followed, or whether the jury has disregarded them altogether. Where there has been inconsistent instruction on the essential elements of the crime charged, as there was here, it should not be tolerated on appeal.  Here especially, where inconsistent instruction on the elements of the crime may have

led to a conviction resulting in the death penalty, this Court should not have to think twice before reversing the conviction and granting a new trial--reversal should be automatic.

The dangers inherent in inconsistent instruction on the essential elements of aggravated kidnapping are further magnified by the general verdict returned by the jury which fails to disclose the theory or theories the jury applied in reaching its verdict. The verdict stated:

"A. We, the jury, in the above-entitled cause, find the defendant Guilty of the offense of Aggravated Kidnapping as Charged.

"B. We further find that Peggy Harstad [did] [did not] die as a result of said Aggravated Kidnapping.

"(Strike out bracketed word or words that do not apply)."

To find Coleman guilty of aggravated kidnapping, the jury had to find that Coleman, in restraining or secreting the woman, had, as his purpose at least one of those purposes listed in instructions no. 37, 38 and 39. How can we tell which purpose or purposes the jury used in reaching its decision? And, because the instructions are inconsistent on an essential element of the crime, how can we tell which instruction the jury used? And, because the instructions are inconsistent, can we be sure that the jury used any of the three instructions?

The aggravated kidnapping charge must be reversed. First, in a criminal case inconsistent instructions as to an essential element of a crime, requires a reversal and a new trial. See Price, 622 P.2d 160, and cases cited in my dissent (622 P.2d 168, 37 St.Rep. 1935A). Second, the trial court erred in failing to instruct the jury that its verdict must be unanimous on any theory or theories of criminal responsibility

charged by the State. People v. Olsson, supra, People v. Embree, supra; State v. Golliday, supra; State v. Bleazard, supra; People v. Thompson, supra; United States v. Gipson, supra. Third, the trial court submitted ambiguous verdict forms to the jury, and the verdict returned fails to disclose the statutory theory or theories on which the jury based its guilt determination. Fourth, consider that substantial evidence does not support each of the statutory theories submitted to the jury. State v. Green (1980), 94 Wash.2d 216, 616 P.2d 628. And finally, consider that the aggravated kidnapping conviction laid the foundation for imposition of the death penalty. Reversal is absolutely required if the judicial system is to maintain its integrity.

## SUBSTANTIAL EVIDENCE DOES NOT SUPPORT EACH OF THE ALTERNATIVE THEORIES GIVEN TO THE JURY

In instruction no. 38, the jury was told that it could convict Coleman by finding that he held or secreted the woman for the purpose of committing sexual intercourse without consent or for the purpose of committing aggravated assault. There is no substantial evidence to support either of these theories.

There is not a shred of evidence to establish that when the woman was first held or secreted, Coleman then had as his purpose that of committing sexual intercourse without consent. When the woman was kidnapped, according to the testimony of accomplice Nank, it was their purpose to rob the woman and to kill her. In fact, it was not until sometime later, at Nank's initiation, that Coleman (according to Nank) accomplished an act of intercourse with the woman. The fact that accomplice testimony, however weak (corroborated only by a negroid pubic hair found in the woman's car),

-66-

indicated that at some time during this episode Coleman had intercourse with the woman, fails to establish that Coleman had intercourse as his purpose in holding or secreting her. Even under holdings which assume jury unanimity by the giving of a general instruction, e.g. State v. Souhrada, supra, the conviction must be reversed because substantial evidence does not support the alternative theory that Coleman held or secreted the woman in order to accomplish an act of sexual intercourse without consent.

Nor is there substantial evidence to support a conclusion that Coleman had as his purpose in holding or secreting the woman to commit an aggravated assault upon her. Accomplice Nank testified that he and Coleman planned to rob and kill the first person they got a ride from, but this does not establish that it was Coleman's purpose to commit an aggravated assault upon the woman. Although it can be argued that an aggravated assault would be committed in the process of killing the woman, it nonetheless does not establish that Coleman held or secreted the woman for the specific purpose of committing an aggravated assault.

Instructions no. 37, 38 and 39 also each provide that Coleman could be convicted of aggravated kidnapping if he had as his purpose in holding or secreting the woman, to inflict bodily injury upon her. Substantial evidence does not support this theory, either. Accomplice Nank's testimony states only that it was their purpose to rob and kill the person who picked them up. Although it can again be argued that a purpose to kill subsumes a purpose to inflict bodily injury, it nonetheless does not establish the fact that Coleman held or secreted the woman for the specific purpose of inflicting bodily injury upon her.

Instructions no. 37 and 39 told the jury that if could convict Coleman of aggravated kidnapping by finding that he had the purpose in holding or secreting the woman, to terrorize her. There is not a shred of evidence to support this conclusion either. Assuming the testimony of accomplice Nank to be true, undoubtedly the woman, at some stage of the events leading to her death, was terrified. But Nank never did testify that he or Coleman had the specific purpose to terrorize the person who gave them a ride.

Based on accomplice Nank's testimony, and assuming it to be sufficiently corroborated, Coleman could have been charged under the aggravated kidnapping statute with having the specific purpose to commit two felonies:   robbery and homicide.   (See, section 45-5-303, MCA.)   But he was not so charged.   Rather, he was charged with having the specific purpose, among others, of committing sexual intercourse without consent, of committing an aggravated assault, of inflicting bodily injury, and of terrorizing.   Substantial evidence supports none of these theories.   Even under holdings which assume jury unanimity by the giving of a general instruction, e.g., State v. Souhrada, supra, Coleman's conviction must be reversed because the jury may have convicted on a theory not supported by substantial evidence.

We should be compelled to reverse this conviction and grant a new trial.   The jury instructions are inconsistent on the essential elements of the crime charged.   There is no assurance that the jury reached a unanimous verdict on at least one of the alternative theories of criminal responsibility set out for establishing Coleman's purpose in holding or secreting the woman.   For at least four of those purposes listed in the instructions, there is no substantial evidence

-68-

there is no corroboration for this testimony. The negroid pubic hair found in the woman's car certainly does not corroborate that he used physical force. There is no assurance that the jury based its conviction on this definition of "without consent."

By instruction no. 33, the jury could also convict Coleman by finding that he had intercourse with the woman by threatening her or anyone else with imminent death, bodily injury, or kidnapping. But Nank's testimony negates the conclusion that Coleman accomplished intercourse by making any of these threats. There is no evidence Coleman threatened her or anyone else with imminent death, bodily injury, or kidnapping. The lack of substantial evidence in the record to support this alternative theory of proving the essential element of "without consent," requires that the conviction be reversed.

Furthermore, substantial likelihood exists that the jury used a theory not supported by the evidence to convict Coleman of sexual intercourse without consent. The jury made an additional finding, later held by this Court in Coleman I to not be supported by substantial evidence (579 P.2d at 742-43), that Coleman had inflicted physical injury on her while accomplishing the act of intercourse. Because the jury made this finding, the likelihood is that it determined that Coleman threatened her with bodily injury and then carried it out by actually inflicting physical injury. There is, however, no substantial evidence to support that conclusion and this Court has already determined that the jury erred in finding that Coleman inflicted physical injuries upon her.

Beyond the substantial evidence question, however, is still the fact that Coleman may have been deprived of a

-70-

unanimous jury verdict on the issue of "without consent."
There is no assurance that the jury was unanimous on this
issue. The jury was not instructed that it must reach a
unanimous verdict on any "without consent" theory. Our
standard of review is again governed by Chapman v. California,
supra. Proper application of Chapman requires that the
sexual intercourse without consent conviction be reversed
and a new trial granted. See, United States v. Gipson,
supra.

## PART III

### A JUDGE WHO HAS IMPOSED THE DEATH PENALTY ON A DEFENDANT SHOULD NOT SIT ON THAT DEFENDANT'S APPLICATION FOR POST-CONVICTION RELIEF

The majority blandly decides in Part II of its opinion
that general policy considerations require that the sentencing
judge or trial judge also preside over a petition for post-
conviction relief. As a general proposition, I agree with
this holding. However, such a holding should never apply
in a case where the defendant has been sentenced to death.
Further, because of the allegations made in the petition for
post-conviction relief, the sentencing judge should have
removed himself from the case.

Where a sentencing judge has already imposed the death
penalty, it offends my sensibilities that this same judge
should preside over the defendant's petition for post-
conviction relief. This is especially so, where the petition
not only attacks the validity of the conviction, but also
attacks the validity of the sentence and the conduct of
the sentencing judge in imposing the sentence. How can
this Court give any credence to the decisions of the judge
when, in acting on the petition for post-conviction relief,
he has simply adopted verbatim the findings and conclusions
proposed by the State of Montana. (See Appendix A to this

-71-

dissent.)  If post-conviction relief is to have meaning, and especially in a death penalty case, due process of law must require that the judge carefully consider each of the issues raised by the petitioner.  Needless to say, he failed miserably in this case.

Additional allegations Coleman makes in his petition for post-conviction relief directly or indirectly attacking the fairness of the sentencing judge, also required that a different judge preside over Coleman's final attempt to get justice within the state court system. Furthermore, Coleman stated in his petition that he would have to call the sentencing judge as a witness to obtain evidence of his claims. These allegations required, especially in a death penalty case, that the sentencing judge call in another judge to preside over the hearing.

Issue C claims that the sentencing judge, without notice to Coleman, amended the information before the trial started, and without legal authority to do so.  He alleges this was an amendment of substance because without it, the death penalty could not have been triggered in the event of a conviction for aggravated kidnapping.  The sentencing judge added the words to the information "resulting in the death of Peggy Lee Harstad."  It cannot be doubted that this jury finding triggered the application of the death penalty, for the statutes then mandated the death penalty in the event of such a determination.  See, Coleman I, 579 P.2d 732. The essence of Coleman's claim is that the trial court would get the death penalty in the event of a conviction.

To establish the judge's intentions, Coleman wanted the judge to testify.  In Coleman II, 605 P.2d 1000. I dissented to this Court's decision in effect validating the judge's amendment of the information.  (I know of no authority

-72-

permitting the judge to become an advocate by changing the charge.) This amendment, which mandated the death penalty in the event of a conviction, was the beginning of the orchestration of the proceedings by the trial court which eventually led to Coleman being sentenced to death.

Issue Y claims that the judge made his decision to hang Coleman before the judge even held the sentencing hearing. ~~Coleman alleges the undeniable fact that the sentencing hearing.~~ RTC Coleman alleges the undeniable fact that the sentencing judge arrived at the hearing with his findings and conclusions and death sentence already prepared.

I dissented to this procedure in Coleman II, 605 P.2d 1000, and concluded that it was a blatant denial of due process of law. Although I believe that the facts speak for themselves, Coleman alleges in Issue Y that he is entitled to have testimony from the sentencing judge himself as to whether he decided to impose the death penalty before he even held the sentencing hearing. Coleman is entitled to that testimony, even though the judge would never admit that he had prejudged the case. In any event, Coleman would be entitled to ask the judge why he had his sentence of death prepared in advance of the hearing, and whether he also had prepared in advance findings and conclusions and a sentence that did not impose the death penalty.

Issue BB claims that the sentencing judge failed to consider that Coleman had no previous criminal record of any kind. Coleman alleged he needed the testimony of the sentencing court to determine why he had never considered the negative criminal record. The semantics used by the sentencing court have been the subject of my dissent in Coleman II, 605 P.2d 1000, 1002 - 51, and I again elaborate on this issue in part

-73-

VIII of my dissent.

Issue DD claims that the sentencing judge, in ruling that Coleman and Nank burglarized a home earlier on the same day as the crimes involved here, relied solely on the uncorroborated trial testimony of Nank. In Coleman II, I concluded that the sentencing court had no right to make a ruling based on Nank's testimony, and I further dissented to the use of that ruling in denying Coleman full credit for not having a previous criminal background. 605 P.2d 1027 to 1040. If the sentencing judge made this ruling based on testimony or evidence other than provided by Nank at the trial, Coleman claims he is entitled to know the source, and therefore that he must be permitted to examine the sentencing judge. Coleman should have that right.

Issue II claims that the sentencing judge in fact decided that the sentencing statutes were mandatory if it found the existence of an aggravating fact and that mitigating factors were not "sufficiently substantial to call for leniency." Therefore, once the sentencing court made these preliminary findings, Coleman claims that the sentencing judge believed that he was required to impose the death penalty. If this was his interpretation, Coleman claims that this interpretation flies in the face of Supreme Court rulings holding that mandatory provisions are impermissible. Because this interpretation does not exist on the face of the findings and conclusions entered by the sentencing judge, Coleman claims that he needs the testimony of the sentencing judge to find out if he in fact interpreted the statute as mandatory. Coleman is entitled to know if this was the interpretation given by the sentencing judge, and because the judge is the only source of this information, his testimony is imperative.

Issue JJ claims that the sentencing judge believed he was limited by statute to consider only if mitigating factors were "sufficiently substantial to call for leniency . . ." If this is so, Coleman claims that the sentencing court determined that he could not consider other factors which might affect the decision. Only by the testimony of the sentencing judge, Coleman claims, can it be determined how the judge interpreted his obligation in relation to consideration of mitigating factors. Because the sentencing record is not clear on this point, Coleman is entitled to an explanation. That explanation can come only from the sentencing judge.

Issue KK seems to claim that the sentencing judge applied different standards of proof to mitigating factors than he did to aggravating factors. Although the claim is not at all clear, I assume that his claim is that the statute setting forth the aggravating factors has no standard of proof at all, while, on the other hand, the statute setting forth the mitigating factors, requires that these factors be "sufficiently substantial as to call for leniency . . ." The findings and conclusions are silent as to the standards of proof applied to aggravating factors and mitigating factors, and therefore, Coleman claims he is entitled to have the sentencing court testify as to the standards it used in making these findings. Because the sentencing court did not state the standards applied, it is again clear that the only source of what standards were applied must come is testimony from the sentencing judge.

Issue OO seems to be similar to Issue KK. Coleman claims that he is entitled to know precisely what standard the sentencing judge used in finding the existence of aggravating factors and the nonexistence of mitigating factors. He also

-75-

alleges under this contention that the sentencing court may have relied for sentencing, on "evidence, statements, testimony, comments, opinions, letters or telephone calls from other persons, and not presented at any hearing attended by Coleman." Again, the only person who would have this knowledge is the sentencing judge.

If any one of these allegations raised by Coleman is not sufficient by itself to have another judge preside over Coleman's petition for post-conviction relief, certainly the force of all of them combined is undeniable cause for the judge to have removed himself, and in the event of his refusal, for this Court to order his removal. The judicial system is somehow demeaned by not having another judge take a look at the case, even though I am fully aware of the inherent back-scratching proclivities of the trial bench. If it was so important that the sentencing judge preside over the petition for post-conviction relief because of his familiarity with the case and with the issues, I then fail to see how his Court implicitly condones his adoption of the State's proposed findings of fact and conclusions of law--hook, line and sinker.

In addition, Coleman's allegations made the testimony of the sentencing judge imperative--for the judge was the only source of the evidence needed for Coleman to establish his claim. But because of the judge's refusal to remove himself from the case, the judge effectively prevented Coleman from obtaining evidence on these issues.

By writing the opinion so as not to disclose the issues raised, the majority has also denied Coleman the full and fair appellate review to which he is entitled.

## PART IV

### THE MAJORITY HAS ERRED IN PERMITTING THE SENTENCING COURT TO APPLY DEATH PENALTY STATUTES TO COLEMAN WHICH WERE ENACTED AFTER THE DATE OF THE CRIMES

After our decision in Coleman I, the sentencing court again sentenced Coleman to death, but this time the court retroactively applied Montana death penalty statutes enacted after the date of the crimes. In Coleman II, Coleman claimed that application of these death penalty statutes violated the ex post facto clauses of the United States and Montana Constitutions. He further argued that this retroactive application of statutes violated certain Montana statutes designed especially to prohibit retroactive application of statutory provisions. In holding against Coleman, the majority stretched the law to the breaking point. 605 P.2d 1000, 1023 - 1026. I dissented on both grounds and concluded that the sentencing court and this Court had violated the United States and Montana Constitutions, as well as existing Montana statutes. 605 P.2d 1000, 1023 - 1026.

Issues Z and AA, again raise these issues and, of course, Coleman again lost before the sentencing court and before this Court. In the omnibus ruling in Part IV, which decided against Coleman on this and 13 other issues by one stroke of the pen, the majority has declared this issue to be res judicata. I have stated my views once in Coleman II, and need not repeat them here. I would hold that we have violated the United States Constitution and our own constitution in retroactively applying the death penalty statutes, as well as violating statutes designed to prevent this very kind of unfairness. By properly applying the standards set out in United States v. Sanders, supra, I would again review this question and grant the relief requested.

-77-

THE SENTENCING STATUTES UNCONSTITUTIONALLY REQUIRE THE
DEFENDANT TO PERSUADE THE SENTENCING COURT THAT HIS LIFE
SHOULD BE SPARED

By Issue OO, Coleman states that section 46-18-305,

MCA, unconstitutionally shifts the burden of persuasion to

him to prove mitigating facts and to persuade the sentencing

judge that his life should be spared.  The relevant part of

section 46-18-305 provides:

> ". . . the court . . . shall impose a sentence
> of death if it finds one or more of the aggravating
> circumstances and finds that there are no mitigating
> circumstances sufficiently substantial to call for
> leniency."

This statute undoubtedly places the burden on a defendant

to persuade the sentencing judge that his life should be

spared.  In adopting verbatim the State's proposed findings

and conclusions on this point, the sentencing court totally

missed the issue raised.  The court ruled:

> "OO.  Montana's capital sentencing scheme provides
> for the consideration of mitigating circumstances,
> a provision which benefits capital defendants.  The
> issue presented involves only sentencing, not guilt
> or innocence, and petitioner's due process claims
> are without merit.  See Coleman II, 605 P.2d at
> 1057, cert.den. 100 S.Ct. ~~2592~~, and State v. Watson,
> Ariz., 586 P.2d 1253, 1258 ∧(1978), cert.den. 440
> U.S. 924.                        2952

The majority, in its omnibus ruling in part V disposed

of this and 12 other issues on the ground that they are res

judicata and vague.  Issue OO is neither.

Contrary to the trial court's ruling that we ruled

on this issue at 605 P.2d at 1057, in Coleman II, and

contrary to the implication of the decision here, we did

not rule on this issue.  Rather, the majority held in Coleman

II that section 46-18-305, MCA does not limit the sentencing

court "from considering any aspect of the defendant's record

or character as a mitigating factor."  This ruling says

nothing about the shifting of the burden of persuasion.  The

claim cannot be vague where Coleman asserts that section

-78-

46-18-305 unconstitutionally shifts the burden of persuasion to him to convince the sentencing court his life should be spared. This section unmistakeably shifts the burden of persuasion; the question is whether it is constitutional to do so. Both the trial court and this Court have failed to rule on this issue

This question was raised in Lockett v. Ohio (1978), 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973, but the Supreme Court vacated the death sentence on other grounds and so specifically declined to rule on this issue. 438 U.S. 609, n. 16, 98 S.Ct. 2967, N. 16, 57 L.Ed.2d 992, n. 16. I would hold that the Montana statute is unconstitutional. In a capital offense, basic fairness in the sentencing process requires that the state have the burden of proving the existence of aggravating factors, and the nonexistence of mitigating factors. Further, the State should have the burden to convince the sentencing court that the defendant's life should be taken.

In all criminal trials, the defendant is presumed innocent, and the State must prove each essential fact beyond a reasonable doubt. In Re Winship (1970), 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368. This rule should not be permitted to evaporate in the sentencing stages where the results of that process may result in a death sentence unless the defendant can prove substantial mitigating factors and can also convince the sentencing court to spare his life. At a sentencing hearing, to keep the burden on the state, the presumption must be that the defendant is entitled to a punishment less than death and the State must prove all those factors necessary to the imposition of the death penalty. Those burdens were not met here, for not only did the statute impose the burden on Coleman that his life

-79-

should be spared, Coleman also had no meaningful opportunity to present his case because the sentencing court came to the sentencing hearing with an order imposing the death sentence ready to be filed at the end of the hearing. Given this fact, how can anyone conclude that the sentencing court had not already decided to impose the death penalty?

PART VI

RIGHT TO JURY TRIAL ON DEATH PENALTY ASPECT OF CRIME

Issues HH and PP claim that Coleman has a right to a jury trial on the death penalty aspects of this case. In Issue HH, he claims that the jury should have the final right to determine whether he should live or die. By Issue PP, he claims that the jury should have the right to determine the presence or absence of both aggravating factors and mitigating factors. He has raised only one of these issues before, Issue PP, and this Court in Coleman II, ruled against him. 605 P.2d 1015 to 1018. I dissented. 605 P.2d 1022.

By adopting verbatim the findings and conclusions prepared and presented by the State, the trial court, of course, decided against him. (See, Appendix, Issues HH and PP of sentencing judge's order.) In part IV of its omnibus ruling disposing of 27 issues, this Court today rules against him, without ever discussing the issue as to whether the jury should be the ultimate sentencing authority in a capital case.

Contrary to the implied assumption of the majority opinion, this issue is not foreclosed. In Lockett v. Ohio, supra, Lockett claims that she had a right to a jury trial on all issues and that a jury should decide the ultimate issue of life or death. The United States Supreme Court,

-80-

however, vacated the death sentence on other grounds, and expressly reserved judgment on this issue. 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973. The court expressly noted in footnote 10: "nor do we address her contention that the Constitution requires that the death penalty be imposed by a jury . . ."

If the death penalty can be called civilized, the only way it can remain so within concepts of contemporary community standards, is to require the jury to make that final, fateful decision. In Humphrey v. Cady (1972), 405 U.S. 504, 509, 92 S.Ct. 1048, 31 L.Ed.2d 394, the United States Supreme Court recognized that in determining facts and being involved in capital sentencing "the jury serves the critical function of introducing into the process a lay judgment, reflecting values generally held in a community." Later, in Gregg v. Georgia, supra, the Court recognized the need to involve the juries in the capital sentencing process as "a significant and reliable index of contemporary values." 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859. And eight years earlier, the Supreme Court stated that jury involvement in a capital case serves "to maintain a link between contemporary values and the penalty system--a link without which the determination of punishment could hardly reflect 'the evolving standards of decency that mark the progress of a maturing society.'" Witherspoon v. Illinois (1968), 391 U.S. 510, 520, n. 15, 88 S.Ct. 1770, n. 15, 20 L.Ed.2d 776, n. 15.

In my dissent in Coleman II, I briefly set out my views as to why a jury should be involved in the sentencing process in a capital case, and why a jury should make the final and fateful decision whether a defendant should live or die. 605 P.2d at 1045. My experience since then, in dealing with

-81-

the capital cases that have been and are now before this Court for review, has convinced me even more of the correctness of this view.

In addition to what I stated there, all that I have stated concerning the procedural irregularities and errors that took place before the trial, during trial, and after trial (during the sentencing process) should be considered. The final blow to Coleman in his application for post-conviction relief, came when the trial court adopted verbatim the proposed findings and conclusions presented by the State of Montana, denying any relief to Coleman, and affirming all that the trial court had done before.

Combine all the errors or irregularities taking place during the history of this case, and I do not believe too many appellate courts could state in good conscience that Coleman has been granted due process of law sufficient to sustain constitutional attack. Add to that the fact that we are dealing with a death penalty case, and I don't think any appellate court could state in good conscience that Coleman has been granted due process of law. In effect, by refusing to discuss or even identify any of the substantive issues raised by Coleman in his petition for post-conviction relief, the majority here has done nothing more than rubber-stamp the findings and conclusions of the trial court and those findings and conclusions came straight from the State of Montana's typewriter.

PART VII

DEATH BY HANGING AS CONSTITUTING CRUEL AND UNUSUAL PUNISHMENT

Issue TT claims that death by hanging constitutes cruel and unusual punishment under 1972 Mont. Const., Art. II, § 22, and under the Eighth and Fourteenth Amendments to the

-82-

United States Constitution. Coleman points out that only three states permit death by hanging (Montana, Delaware and Washington) and it has been rejected in all other American jurisdictions and in all European jurisdictions. (I note here that since Coleman filed this claim, the Washington State Supreme Court has held that death by hanging constitutes cruel and unusual punishment. State v. Frampton (1981), ___ Wash.2d ____, 627 P.2d 922.) He alleges that persons executed by hanging die slowly, usually by strangulation, and suffer extreme pain in excess of that inherent in the extinguishment of life. He further alleges that one of the reasons for this slow, tortuous form of death, is that competent hangmen no longer exist in the United States or elsewhere, and therefore the hanging cannot be competently administered.

The trial court disposed of this issue by reference to the majority opinion in Coleman II, ____Mont.____, 605 P.2d 1000, 1059, where the majority simply deferred to the legislature and stated: "We have no power to change these settled provisions of the law, nor can we say that hanging is constitutionally cruel or unusual." The majority opinion has simply denied this claim in its omnibus ruling in part VI of the opinion, disposing of this and 6 other claims.

The court states that it has no power to change the law, but the simple fact is that courts have from the beginning of the separation of powers, been changing the law--yes, even settled provisions of law. The real reason is simply that the majority does not want to change the law in this case. But Coleman claims here that he is entitled to an evidentiary hearing to establish that death by hanging is in fact cruel and unusual. This question cannot be rationally

decided without first considering the scientific or expert evidence that is now available. The Washington Supreme Court did so, and quoted some graphic testimony and statements as to the barbarity of hanging as the method of inflicting capital punishment. 627 P.2d 934 to 936.

The United States Supreme Court has repeatedly stated that the Eight Amendment--prohibition against cruel or unusual punishment--"must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles (1958), 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630. Using this standard ". . . what might have been common and not thought to be cruel or unusual in 1789 might be completely obnoxious to society in the United States today." Owens-El v. Robinson (1978), 442 F.Supp. 1368, at 1375. The legislature certainly does not have the right to be the last word on the constitutionality of its own legislation, but that is precisely the effect of the court's opinion in Coleman II, and ratified here today sub-silencio.

The fact that the legislature has provided for hanging as the prescribed method of carrying out the death penalty, or the fact that the legislature has refused to change the method of execution, does not enshrine the legislation on a throne of invincibility from constitutional attack.

I would grant Coleman an evidentiary hearing on this issue. Perhaps the evidence would be revealing to all, perhaps even to members of the legislature.

In addition to what I have stated here ████████████ ████████████████████████████████████████████████████ ██████████████████████ parts II, III and VIII of this dissent should ██████ be considered ████████ The combination of

-84-

these factors screams loudly for a constitutional require-
ment that only a unanimous jury should be permitted to make
the fateful decision of life or death. My experience has
been that the judiciary of this state is incapable of fairly
and rationally administering a death penalty law. Only by
interposing a jury between the defendant and the judiciary
can there be any assurance of decisions arrived at only
after fair consideration of all the facts.

PART VIII

DENIAL OF MEANINGFUL APPELLATE REVIEW

Issue QQ alleges that in our first review of the death
sentence (Coleman II) we denied him meaningful appellate
review. In Coleman II, after reviewing several factors which
the majority had either overlooked or ignored, I stated that
". . . it is virtually impossible to rationally and fairly
administer and enforce a statutory scheme of capital punish-
ment." 605 P.2d at 1045. As this, and two other death
penalty cases continue to tortuously wind their way through
this state's court system, I am more convinced of the correctness
of this statement. The sentencing courts and this Court
just seem to have approached these cases with their eyes
closed.

Similar views were stated by Justice Marshall in a con-
curring opinion in the case of Lockett v. Ohio, supra, where
he expressed disgust with the way the trial courts and
appellate courts of the various states were administering
their capital punishment statutes in an apparent attempt to
meet minimum constitutional standards. He stated:

> "The opinions announcing the judgment of the
> Court in Gregg v. Georgia, 428 U.S. at 188-198
> (opinion of Stewart, Powell and Stevens, J. J.)
> Jurek v. Texas, 428 U.S. 262, 271-276 (1976)
> (opinion of Stewart, Powell, and Stevens J. J.),

-85-

and Profitt v. Florida, 428 U.S. 242, 259-260
(1976) (opinion of Stewart, Powell, and Stevens,
J. J.), upheld the constitutionality of the death
penalty, in the belief that a system providing
sufficient guidance for the sentencing decision
maker and adequate appellate review would assure
'rationality,' 'consistency,' and 'proportionality'
in the imposition of the death sentence. Gregg
v. Georgia, supra, at 276. That an Ohio trial court
could impose the death penalty on petitioner under
these facts, and that the Ohio Supreme Court on
review could sustain it, cast strong doubt on the
plurality's premise that appellate review in
state systems is sufficient to avoid the wrongful
and unfair imposition of this irrevocable penalty."
438 U.S. at 621, concurring opinion.

In his petition for post-conviction relief, Coleman
outlined how this Court had failed to adhere to the statutes
requiring mandatory appellate review. In disposing of this
contention, the trial court simply adopted the one sentence
conclusion proposed by the State: "QQ. The review provided
petitioner by the Montana Supreme Court was carefully outlined
and applied in Coleman II, 605 P.2d at 1020-21." In Coleman
II, I dissented to our review and concluded that it was
woefully inadequate. 605 P.2d 1032-1047. I fail to com-
prehend how the majority can, in its omnibus ruling in
section five, dispose of Issue QQ and 12 other issues,
by the bland statement that the trial court properly dis-
missed this claim "as res judicata because the vague new
allegations do not affect the validity of the prior deter-
mination of the Court . . ."

If this Court has never before decided the issue of
whether we denied Coleman meaningful appellate review in
Coleman II, I fail to see how this issue can be res judicata.
In addition, I fail to see that Issue QQ is vague where
Coleman cites a specific statute that this Court has absolutely
failed to adhere to in reviewing the death sentence.

In Issue QQ, Coleman raises two questions concerning
our failure to give him meaningful appellate review. He

-86-

has, however, throughout his petition, raised other issues concerning our review, and I feel it is appropriate to consider these issues in this portion of my dissent. I will first discuss the issues raised in Issue QQ.

Coleman first claims, and correctly so, that this Court has never promulgated procedural rules to implement the mandatory requirements for determining whether a sentence of death is disproportionate to the sentence imposed in similar cases. Second, he claims, and correctly so, that our review contemplated by statute and mandated by Gregg v. Georgia (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d ~~895~~ 859, has failed to consider other cases where a defendant has been convicted of deliberate homicide or aggravating kidnapping.

This Court is specifically required to grant automatic proportional review to all death sentence, and to promulgate rules under which the review is conducted. In response to decisions of the United States Supreme Court, the legislature enacted section 46-18-310, MCA, and subsection 3 specifically states that the Montana Supreme Court shall determine:

> "Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. The court shall include in its decision a reference to those similar cases it took into consideration."

To facilitate this review, section 46-18-308, MCA, states in part that the automatic review mandated by statute ". . . shall be heard in accordance with rules promulgated by the Supreme Court." (Emphasis added.)

Coleman rightly claims that this Court has never promulgated the rules to provide method and procedure under which death sentence are reviewed for proportionality. He further claims, and this cannot be denied, that he has asked this Court to promulgate the rules. The simple fact is that even to this date, this Court has not yet promulgated

those rules. How, then, is Coleman to get the review to which he is entitled? How can this Court sanction the imposition of the death penalty whenit has failed to first comply with the statutory requirement that we adopt rules setting forth the method by which proportional review is conducted? Obviously, a federal court will have to answer this question.

A second, and even more serious claim, because it involves the actual proportional review conducted by this Court, is that we failed to comply with the proportional review mandated by Gregg v. Georgia, supra. Gregg requires that on mandatory review the state's highest appellate court, that the court consider "whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." This language means that our system of review must allow access to and a consideration of all reasonably recent cases in this state where a defendant has been convicted of either deliberate homicide or aggravated kidnapping.

Our duty is to review each of these cases and consider the nature of the crime involved and the individual characteristics of the persons who committed the crimes. We must then compare those situations with the crimes committed here and with the personal characteristics of the person involved here. This Court has wholly failed to provide proportional review as mandated by Gregg, and I therefore fail to see how this Court can sanction the imposition of the death penalty.

I would hold, therefore that on Issue QQ alone, Coleman is entitled to again come before this Court for proportional review--after this Court has promulgated the rules required by statute.

I next consider our review of other issues raised by Coleman concerning the sentencing court's findings and conclusions, and our failure to review these issues. By either overlooking or cavalierly disposing of the issues without discussion or even identification, we have further denied meaningful appellate review to Coleman. I repeat that we are statutorily required to review all death penalty sentences to see that there has been full statutory compliance in the sentencing process. We are further required to review all of the sentencing court's findings and conclusions, even if no issue concerning them has been raised by the defendant. Section 46-18-310, MCA.

In Issue BB and Issue DD, Coleman alleges failure of the sentencing court and this Court to give consideration to the fact that he had no criminal background--he had not even been charged or arrested for a misdemeanor. Issue BB claims that the sentencing court should have ruled as a matter of law that Coleman had no significant history of criminal conduct. Issue DD claims that the sentencing court improperly found that, on the same day as the offenses charged here, Coleman and Nank had burglarized a house in Roundup, Montana, and therefore that Coleman was not really entitled to a designation of having no significant criminal conduct. Coleman further claims that the trial court based this burglary finding on Nank's uncorroborated trial testimony. It was error to base this finding on Nank's uncorroborated testimony. And it was also error because Coleman had no opportunity to cross-examine Nank at the sentencing hearing; nor did he have any opportunity to offer rebuttal evidence at a sentencing hearing. This finding was first revealed while the trial court was reading the death sentence.

Despite these substantial claims, the majority here has responded only in silence. I dissented in Coleman II to the sentencing court's findings and to the methods by which it made its decisions. 605 P.2d 1035-1036. The undeniable fact is that the sentencing court used Nank's trial testimony as the basis to find that Coleman had committed a burglary on July 4, 1974, and therefore that Coleman was not entitled to full credit for having no significant history of criminal conduct. In fact, I concluded that by its findings and conclusions, the sentencing court had stretched the law to the breaking point in order to impose the death penalty. 605 P.2d 1039-1040. Our failure to grant meaningful appellate review in Coleman II further amplified the failure to follow the statutory guidelines.

Based on the record before the sentencing court--Coleman had never before been arrested or charged for any kind of offense-I believe that compliance with section MCA, requires that the sentencing court find as a matter of law that Coleman had "no significant history of criminal conduct." The sentencing court's reliance on Nank's uncorroborated trial testimony, the failure of the trial court to reveal the basis of this finding so that Coleman could cross-examine Nank at the sentencing hearing or present rebuttal evidence, convinces me that the sentencing court had sealed Coleman's fate with the hangman long before the sentencing hearing. No appellate court should tolerate the procedures used by the trial court in imposing the death penalty, for they constitute a flagrant denial of due process of law.

This predetermination to impose the death penalty is further illustrated by the sentencing court's failure to consider Coleman's particularized circumstances, a requirement mandated by Gregg v. Georgia, supra, and also required

by statute. Section 46-18-302, MCA. In my dissent in Coleman II, I emphasized that the findings and conclusions used as the foundation for the death sentence, are barren of any reference to Coleman's particularized background. 605 P.2d 1036-1038. How can we, as an appellate court, know that Coleman's particularized background was considered, and what weight was given to it, unless both are mentioned in the findings and conclusions? This is yet another reason why the sentencing procedures utterly failed to comply with the spirit of the mandate contained in Gregg v. Georgia.

Issue Y again claims that Coleman was denied due process of law when the sentencing court came to the sentencing hearing with the judgment of death already prepared and ready for filing at the end of the hearing. Section 46-18-310(1), MCA requires that this Court review any death sentences to determine if it was "imposed under the influence of passion, prejudice, or other arbitrary factor." Proper application of this statute requires that this Court set aside the death penalty because of the ugly implication inherent in the sentencing judge coming to the sentencing hearing armed with his death judgment.

I dissented to the judge's conduct in Coleman II, 605 P.2d 1000, 1022 to 1051, and I do so again. It is beyond my comprehension that this Court can uphold this conduct. But recognizing that this Court is insensitive to this issue, the combination of all the factors set forth in my dissent, should require the death penalty to be set aside as violating the statutory guide-lines of section 46-18-302, supra.

Our failure to give Coleman meaningful appellate review in Coleman II is only compounded by our failure today to undo the injustice of that decision. This is Coleman's last chance to obtain review within the state system. But this Court has not even attempted to fairly consider the issues raised. Mandatory

-91-

appellate review of death sentences, required by Gregg v.

Georgia, and ~~not~~ by statute, has failed abysmally in this

case.

The words of Justice Marshall in Lockett v. Ohio, supra,

are again appropriate to end this discussion of our denial

of meaningful review to Coleman, for they express exactly

what has happened to each of these death cases that has come

before this Court:

> ". . . That an Ohio trial court could impose
> the death penalty on petitioner under these
> facts, and that the Ohio Supreme Court on
> review could sustain it, cast strong doubt
> on the plurality's premise that appellate
> review in state systems is sufficient to avoid
> the wrongful and unfair imposition of this
> irrevocable penalty." (438 U.S. at 621,
> concurring opinion.

Substitute the word Montana for the word Ohio, and

Justice Marshall's comments fit the Montana situation like

a glove fits a hand. The opinion written by this Court today

has denied Coleman due process of law both on questions arising

from his conviction and on application of the death penalty.

CONCLUSION

The majority opinion has one salutary aspect. It has

finally freed Coleman from the yoke of the state court system

and permits him to pursue his claims in federal court. A

federal court cannot help but be more receptive to the important

questions that Coleman has raised but this Court has turned

down by wholesale and summary disposition. I cannot conceive

that this case will leave a federal court with the abiding

conviction that justice was done.

Daniel J. Shea
Justice

CASE NO. 9115 12
FILE NO. 12

IN THE DISTRICT COURT OF THE SIXTEENTH JUDICIAL DISTRICT

OF THE STATE OF MONTANA, IN AND FOR THE COUNTY OF ROSEBUD 81

FILED

Ellen L. Clark CLERK

Marilyn Berry DEPUTY

-oo-

DEWEY EUGENE COLEMAN,                     ) Civil No. 9115
                                          ) Criminal No. 1083
                        Petitioner,       )
                                          ) COURT'S CONCLUSIONS,
        -vs-                              ) MEMORANDUM & ORDER
                                          )
THE STATE OF MONTANA,                     )                367
                                          )
                        Respondent.       )
--------------------------------------------------------------

The Court having considered briefs and proposed findings and conclusions of petitioner and respondent, adopts the findings and conclusions of respondent, as follows:

### PROCEDURAL BACKGROUND

Following the October 6, 1980, dissolution of Justice Marshall's stay of petitioner's execution date, respondent moved this court to set a new execution date for defendant. This court then notified the parties that a new date of execution would be set on October 24, 1980. On the date set for this hearing, petitioner filed a petition for postconviction relief raising 49 separate claims for relief. In addition, petitioner submitted a motion moving the court to "enter an order recusing itself as the presiding judge in this cause."

On the same day, prior to its consideration of the motion to recuse, this court granted a motion submitted by respondent and ordered petitioner to submit an amended petition within ten (10) days "raising all constitutional grounds for relief . . . of which he has knowledge at this time and to so allege in his amended petition." The motion

Exhibit A

-1-

12-367

to recuse was taken under advisement by this court pending the submission of a response by respondent and a reply by petitioner. The court denied the motion to recuse on November 21, 1980.

368

Petitioner filed his amended petition for post-conviction relief on December 12, 1980, this time raising 52 separate claims for relief. The parties thereafter entered a stipulation to the effect that respondent would file its motion to dismiss petitioner's amended petition on December 22, 1980. Petitioner would file his answering brief on or before January 5, 1981, and respondent would reply by January 12, 1981. Finally, a hearing on the motion to dismiss was scheduled for January 15, 1981.

The motion to dismiss came on regularly for hearing on the 15th day of January, 1981, with petitioner, Dewey Eugene Coleman, appearing in person and through his counsel, Charles F. "Timer" Moses, and the State of Montana, appearing through John H. Maynard, Assistant Attorney General, and John S. Forsythe, Rosebud County Attorney, whereupon oral argument was presented to the Court. Petitioner and respondent were directed to submit proposed findings and conclusions to the court by February 1, 1981, at which time the matter would be deemed submitted. The court having duly considered the matters submitted to it,

NOW THEREFORE, IT IS ORDERED as follows:

Respondent's MOTION TO DISMISS petitioner's PETITION FOR POSTCONVICTION RELIEF should be, and hereby is, granted.

CONCLUSIONS

Star Printing Co. Miles City, Mont.

-2-

I. THE MOTION TO DISMISS IS GRANTED BECAUSE THE AUTOMATIC REVIEW PROCEDURES OF TITLE 46, CHAPTER 18, PART 3, OF THE MONTANA CODE ANNOTATED ARE THE EXCLUSIVE REVIEW PROCEDURES AFFORDED PERSONS UNDER SENTENCE OF DEATH IN MONTANA. 369

The necessity of finality in criminal proceedings, especially those involving the death penalty, coupled with the automatic and comprehensive review procedures in death penalty cases provided for in Montana statutes, establish that the Montana legislature did not intend that the post-conviction procedure act afford defendants convicted of capital offenses a "second appeal." Title 46, Chapter 18, part 3, M.C. A. clearly contemplates an automatic, comprehensive, and final adjudication of issues presented in death penalty cases. The Montana Supreme Court recognized this fact in petitioner's case when it stated that "...completion of this review will mark the end of state action upon this cause..." State v. Coleman, Mont., 605 P.2d 1000, 1006 (1979), cert. denied, 100 S.Ct. 2952 (1980).

To allow petitioner to seek postconviction relief is, in effect, to provide petitioner with two appeals, a result not contemplated by the legislature or the Montana Supreme Court. States are free to devise their own systems of review in criminal cases. Carter v. Illinois, 329 U.S. 173, 175 (1946). Repetitious appeals in death panalty cases are not constitutionally required and accomplish little more than to frustrate public confidence in the entire criminal justice system.

II. THE MOTION TO DISMISS IS FURTHER GRANTED AS TO 27 OF PETITIONER'S CLAIMS BECAUSE THEY ARE BARRED BY RES JUDICATA.

Star Printing Co. Miles City, Mont.

-3-

The following 27 issues have been previously considered and decided by the Montana Supreme Court and petitioner has alleged no new facts or law with respect to these issues that might affect the result reached in his prior appeals:

F, G, H, I, J, L, M, N, P, R, S, T, V, W, Y, Z,

AA, DD, GG, HH, II, JJ, KK, LL, MM, NN, and PP.

Each of these claims has been considered by the Montana Supreme Court in State v. Coleman, Mont., 579 P.2d 732 (1978), hereafter referred to as Coleman I, or in State v. Coleman, Mont., 605 P.2d 1000 (1979), cert. denied 100 S.Ct. 2952 (1980), hereafter referred to as Coleman II. The claims were previously decided against petitioner in prior appeals at the following places.

F. Petitioner's challenge to the jury panel was rejected in Coleman I, 579 P.2d at 746-7, cert. denied 100 S.Ct. 2952.

G. Petitioner's claim regarding the admission into evidence of State's exhibit No. 20 was rejected in Coleman I, 579 P.2d at 751. Furthermore, the claim involves a question of state law and does not amount to a constitutional deprivation.

H. Petitioner's claim involving his challenge to Nank's competency as a witness was addressed in Coleman I, 579 P.2d at 748.

I. Petitioner's claim regarding Nank's testimony concerning his conversations with law enforcement officials was rejected in Coleman I, 579 P.2d at 749.

J. Petitioner's claim regarding restricted cross-examination was rejected in Coleman I, 579 P.2d at 747.

Star Printing Co. Miles City, Mont.

L.   Pettioner's claim concerning the admission into evidence of Exhibit No. 60 was rejected in Coleman I, 579 P.2d at 752.

371

M.   Petitioner's claim in connection with his attempted cross-examination of witness Hippard was rejected in Coleman I, 579 P.2d at 747.

N.   Petitioner's contention regarding evidence of the heighth and fall of the water in the Yellowstone River at the scene of the crime was resolved against him in Coleman I, 579 P.2d at 753.

P.   Petitioner's contention with respect to Instruction No. 22 was ruled on in Coleman I, 579 P.2d at 749.   It was again considered in light of Sandstrom v. Montana, in Coleman II, 605 P.2d at 1052-4, cert. denied 100 S.Ct. 2952.

R.   Petitioner's offered Instruction No. 14 was determined to have been properly refused in Coleman I, 579 P.2d at 750.

S.   Petitioner's claim involving Instruction No. 16 was rejected by the Montana Supreme Court in Coleman I, 579 P2d at 750.

T.   Petitioner's claim that his offered Instruction No. 35A should have been given was considered and rejected in Coleman I, 579 P.2d at 750-1.

V.   Petitioner's claim regarding the denial of his motion for new trial on the grounds of newly discovered evidence was rejected in Coleman I, 579 P.2d at 753.

W.   Petitioner's ex post facto claim that Montana did not have a constitutional death penalty statute at the time

Star Printing Co. Miles City, Mont.

-5-

petitioner committed the crime for which he received the death penalty was considered in Coleman II, 605 P. 2d at 1013-4.

372

Y. Petitioner's claim regarding his opportunity to present argument concerning his sentence following remand after Coleman I was rejected by the Court for the reasons stated in Coleman II, 605 P.2d at 1018.

Z. Petitioner's claim regarding "retroactive" application of the 1977 death penalty amendments was considered in Coleman II, 605 P.2d at 1012.

AA. Petitioner's claim that his sentence violates constitutional provision against ex post fact laws was rejected in Coleman II, 605 P.2d at 1015, cert. denied 100 S.Ct. 2952.

DD. Petitioner's claim regarding the district court's finding that he had participated in a burglary the same day he committed these other crimes was considered in Coleman II, 605 P.2d at 1020. Section 46-18-302, MCA.

GG. Petitioner's claim regarding the exclusion of two jurors was rejected in Coleman I, 579 P.2d at 741.

HH. Petitioner's claim with respect to jury participation in the sentencing procedure was rejected by the Montana Supreme Court in Coleman II, 605 P.2d at 1017.

II. Petitioner's argument that Montana's death penalty statutes in effect impose a mandatory death penalty was rejected in Coleman II, 605 P.2d at 1016.

JJ. Montana's scheme for the consideration of mitigating circumstances was found to pass constitutional muster

Star Printing Co. Miles City, Mont.

-6-

in <u>Coleman</u> <u>II</u>, 605 P.2d at 1016-7 373

KK.  Petitioner's further contention regarding "stand-ards of proof" was rejected in <u>Coleman</u> <u>II</u>, 605 P.2d at 1057.

LL.  Petitioner's double jeopardy claim based on his convictions for deliberate homicide and aggravated kid-napping are without merit.  <u>Coleman</u> <u>II</u>, 605 P.2d at 1017, <u>cert</u>. <u>denied</u> 100 S.Ct. 2952.

MM.  Petitioner's double jeopardy claim that he cannot be convicted on both charges was rejected.  <u>Coleman</u> <u>II</u>, 605 P.2d at 1017.

NN.  Petitioner's claim regarding sentence review by the Sentence Review Division of the Montana Supreme Court has been rejected by the Montana Supreme Court and the United States Supreme Court.  <u>Cert</u>. <u>denied</u> 101 S.Ct. 255 (1980).

PP.  Petitioner's claim with respect to the requirement of a jury trial on aggravating facts and mitigating circum-stances was rejected in <u>Coleman</u> <u>II</u>, 605 P.2d at 1017.  <u>See</u>, <u>Drake</u> vs <u>Zant</u>, U. S., 49 U.S.L.W. 3371 (1980)(White, J., dissenting from denial of certiorari).

Issues raised in the prior review of petitioner's conviction which have been considered on their merits and determined against him are res judicata and he is not entitled to have those issues redetermined.  <u>In</u> <u>re</u> <u>Quigg</u>, 168 Mont. 512,  544 P.2d 441 (1976), <u>cert</u>. <u>denied</u> 425 U.S. 994 (1976); <u>Orricer</u> v. <u>State</u> 85 S.D. 293, 181 N.W.2d 461 (1970); <u>Williams</u> v. <u>United</u> <u>States</u>, 426 F.2d 253 (9th Cir. 1970), <u>cert</u>. <u>denied</u> 400 U. S. 881.  Prior determination of an

Star
Printing Co.
Miles City,
Mont.

issue constitutes a final adjudication of that issue. <u>State</u> v. <u>Coleman</u>, Mont., 605 P.2d 1000, 1002. As a result, the petition for postconviction relief is dismissed with respect to these claims.

374

III. THE MOTION TO DISMISS IS FURTHER GRANTED AS TO 13 OF PETITIONER'S CLAIMS BECAUSE, WHILE THEY INCLUDE VAGUE NEW ALLEGATIONS, THEY ARE TOO VAGUE, TO STATE NEW CLAIMS, OR ARE UNSUPPORTED BY AUTHORITY AND THEREFORE BARRED BY RES JUDICATA.

The following 13 issues have been previously considered and decided by the Montana Supreme Court.

B, E, K, Q, U, X, CC, EE, FF, OO, QQ, RR, and XX

The validity of the prior determination of the Montana Supreme Court with respect to these issues is not called into question by petitioner's additional allegations.

B. Petitioner's claim alleging discrimination in the plea bargaining process on the basis of race was rejected by the Montana Supreme Court in <u>Coleman</u> <u>I</u>, 579 P.2d at 744-5.

E. Petitioner's claim regarding the recovery of the rope was addressed by the Montana Supreme Court in <u>Coleman</u> <u>I</u> 579 P.2d at 744.

K. Petitioner's claim regarding the testimony of an F.B.I. agent and of Sheriff Makin was addressed in <u>Coleman</u> <u>I</u>, 579 P.2d at 749.

Q. Instruction No. 26 was considered by the Montana Supreme Court in <u>Coleman</u> <u>I</u>, 579 P.2d at 750, and again in <u>Coleman</u> <u>II</u>, 605 P.2d at 1054-6, <u>cert</u>. <u>denied</u>, 100 S.Ct. 2952.

U. Petitioner's claim that the verdict form as to Count II, aggravated kidnapping, was erroneously given was considered in <u>Coleman</u> <u>I</u>, 579 P.2d at 751. Moreover, the jury also convicted petitioner of deliberate homicide.

-8-

THURBER S

HELENA


X. Petitioner's general claim regarding the review afforded his case in <u>Coleman</u> <u>I</u> is vague and meritless on the basis of the opinion issued in that case. No specific error is alleged as part of this claim. 375

CC. Petitioner's claim regarding the district court's consideration of mitigating factors in general was reviewed in <u>Coleman</u> <u>II</u>, 605 P.2d at 1019-20.

EE. Petitioner's claim that he was prejudiced by properly admitted evidence does not state a claim for relief. <u>Coleman</u> <u>II</u>, 605 P.2d at 1020. Moreover, the provisions of the 1977 amendments to Montana's capital sentencing scheme were found to apply to petitioner in their entirety in <u>Coleman</u> <u>II</u>. Section 46-18-302, MCA, requires that evidence admitted at trial be considered for sentencing purposes.

FF. Petitioner's claim that the constitution requires a finding of a specific intent to kill before a capital sentence may be imposed is unsupportable. Moreoever, this court found such an intent when considering the appropriateness of the death penalty at Finding of Fact No. 3(b).

OO. Montana's capital sentencing scheme provides for the consideration of mitigating circumstances, a provision which benefits capital defendants. The issue presented involves only sentencing, not guilt or innocence, and petitioner's due process claims are without merit. <u>See</u> <u>Coleman</u> <u>II</u>, 605 P.2d at 1057, <u>cert</u>. <u>denied</u>, 100 S.Ct. 2952, and <u>State</u> v. <u>Watson</u>, Ariz., 586 P.2d 1253, 1258 (1978), <u>cert</u>. <u>denied</u> 440 U.S. 924.

QQ. The review provided petitioner by the Montana Supreme Court was carefully outlined and applied in <u>Coleman</u> <u>II</u>, 605 P.2d at 1020-1.

-9-

RR. The imposition of the death penalty in petitioner's case has been presented to and approved by the Montana Supreme Court. That determination is binding on this court. As noted in Spinkellink v. Wainwright, 578 F.2d 582, 607 (1978), cert. denied, 440 U.S. 980 (1979), the arbitrariness and capriciousness condemned in Furman are conclusively removed from a death penalty proceeding if the state adheres to its properly drawn death penalty statute.

XX. The aggravating and mitigating circumstances enumerated in Montana's capital sentencing scheme are similar to those approved by the United States Supreme Court and pass constitutional muster under Gregg v. Georgia, 428 U.S. 153 (1976); Proffitt v. Florida, 428 U.S. 242 (1976); Jurek v. Texas, 428 U.S. 262 (1976) and Lockett v. Ohio, 98 S.Ct. 2954 (1978). See Coleman II, 605 P.2d at 1057.

IV. THE MOTION TO DISMISS IS FURTHER GRANTED AS TO 7 OF THE PETITIONER'S CLAIMS BECAUSE THE NEW AUTHORITY CITED IS EITHER INAPPLICABLE TO PETITIONER'S CASE OR CLEARLY DISTINGUISHABLE FROM IT LEAVING THE CLAIMS BARRED BY RES JUDICATA.

The following claims include new allegations of fact or citation to new authority:

A, C, D, O, BB, TT, VV.

The claims do not, however, include new allegations or new citations of authority, which affect the validity of the prior determinations of the Montana Supreme Court with respect to those issues.

A. As part of this claim petitioner asserts that no rational trier of fact could have found beyond a reasonable doubt that petitioner had the purpose, in restraining Peggy Lee Harstad, to inflict bodily injury, citing Jackson v. Virginia, U.S., 99 S.Ct. 2781 (1979) for purposes of establishing a standard of review. That standard of review

has been exceeded in this case as evidenced by the jury verdict and this court's Finding No. 1, which reads in pertinent part:

> In this area Coleman initiated the assault upon the victim by swinging his motorcycle helmet by the chin strap and crashing it against the victim's head. Then the defendant placed the yellow nylon rope around the victim's neck and attempted to strangle her. Then both the defendant and Robert Nank carried the victim down to a slough and, the defendant held her under the water. The victim rose out of the water briefly and then both men went into the water and held her under until she expired.

C. Petitioner's claim regarding the court's amendment of the information was considered in Coleman I, 579 P.2d at 745-6. The recently decided case of State v. Cardwell, Mont., 609 P.2d 1230 (1980), is inapposite because (1) the amendment in petitioner's case was found to be one form and not substance; (2) only substantive amendments without leave of court are affected by Cardwell; and (3) the Cardwell ruling is not retroactive.

D. Petitioner's claim regarding his arrest was ruled on by the Montana Supreme Court in Coleman I, 579 P.2d at 743. The recently decided case of Payton v. New York, U.S., 100 S.Ct. 1371 (1980), is inapposite because Payton has not been given retroactive effect. This is because the new constitutional doctrine it establishes is not one aimed at overcoming an aspect of the criminal trial that substantially impairs its truthfinding function thereby raising questions as to the accuracy of guilty verdicts in past trials. V v. City of New York, 407 U.S. 203, 204 (1972). Moreover, the purpose of the exclusionary rule to deter police misconduct is not served at the post-appeal stage and application of the exclusionary rule deflects the truthfinding process. Stone v. Powell, 428 U.S. 465, 492 (1976).

O. Petitioner's claim of insufficient corroboration of Nank's testimony was considered in Colean I, 579 P.2d at

-11-

748. Petitioner's citation of <u>Jackson</u> v. <u>Virginia</u>, U.S., 99 S.Ct. 2781 (1979), and <u>Pilon</u> v. <u>Bordenkinder</u>, U.S., 100 S.Ct. 15 (1980), do not establish a standard of review for corroborative evidence and are therefore inapposite.

378

BB. Petitioner's claim with respect to the district court's consideration of his prior criminal history as a mitigating circumstance was considered in <u>Coleman II</u>, 605 P.2d at 1019-20. <u>Jackson</u>, <u>supra</u>, and <u>Pilon</u>, do not affect this claim.

TT. Petitioner's Eighth Amendment claim that hanging is a cruel and tortuous method of execution was rejected in <u>Coleman II</u>, 605 P.2d at 1058-9. Establishing a method of execution is properly a function of the legislature. <u>Wilkerson</u> v. <u>Utah</u>, 99 U.S. 130, 134-5 (1879). <u>Gregg</u> v. <u>Georgia</u>, 428 U.S. at 168-173.

VV. Petitioner's claim that his death sentence for the crime of aggravated kidnapping is disproportionate to the offense for which it was imposed is without merit. <u>Coleman II</u>, 605 P.2d at 1057. The death penalty imposed in this case was not the result of kidnapping only, but rather for the offense of aggravated kidnapping resulting in the death of the victim. Section 46-18-303(7), MCA.

V. THE MOTION TO DISMISS IS FURTHER GRANTED AS TO 5 OF PETITIONER'S CLAIMS BECAUSE HE FAILED TO RAISE THEM IN HIS DIRECT APPEAL AND BECAUSE THEY ARE WITHOUT MERIT.

The final five claims that have been raised in petitioner's petition have been raised for the first time in this proceeding. They are:

SS, UU, WW, YY, ZZ.

Petitioner has waived his right to present these issues at this time by failing to raise them in the direct appeal of his conviction. <u>People</u> v. <u>Jenkins</u>, 11 Ill. App. 3d 690, 297 N.E.2d 279 (1973); <u>Andrews</u> v. <u>Morris</u>, Utah, 607 P.2d 816

-12-

(1980), cert. denied 101 S.Ct. 254 (1980). Beyond that the claims are without merit as a matter of law  379

SS. The contention raised here is that the death penalty is imposed so rarely that it serves no legitimate state interests. This claim has been rejected numerous times and is without merit. See Gregg v. Georgia, 428 U.S. 153, 173 (1976); State v. McKenzie, 171 Mont. 278, 557 P.2d 1023, 1033 (1976); Andrews v. Morris, Utah, 607 P.2d at 824 (1980); and State v. Fitzpatrick, Further Order and Findings and Conclusion, p. 18-19 (January 7, 1981).

UU. Petitioner contends that he was denied the right to a unanimous jury verdict. But when the instructions are read as a whole, as they must be under Coleman II, 605 P.2d at 1052, the claim fails. See Cupp v. Naughton, 414 U.S. 141, 147 (1973). In addition, petitioner's reliance on the federal constitution is misplaced in that the federal constitution does not guarantee the right to a unanimous verdict in state felony jury trials. Apodaca v. Oregon, 406 U.S. 404 (1972); Johnson v. Louisiana, 406 U.S. 356 (1972).

WW. Petitioner's claim that the "entire record" was not certified to the Supreme Court because some unspecified proceeding were not transcribed is without merit. Section 46-18-309, MCA, recognizes the distinction between the "record" certified by the sentencing court and the "transcript" prepared by the court reporter. It is the duty of the appellant to select portions of the "transcript" to be submitted in all criminal appeals. Section 46-20-302, MCA.

YY. Petitioner contends that his Eighth and Fourteenth Amendment rights have been violated because of alleged discriminatory application of the death penalty in Montana and in the United States. The allegations he makes in support of this contention are similar to those supporting similar contentions raised in the United States

-13-

Supreme Court in <u>Furman</u> v. <u>Georgia</u>, 408 U. S. 238 (1972), 380 <u>Gregg</u> v. <u>Georgia</u>, 428 U. S. 153 (1976), and <u>Proffitt</u> v. <u>Florida</u>, 428 U. S. 242 (1976), where the court refused to accept the argument. The contention of discriminatory application of the death penalty fails as a matter of law on the basis of <u>Washington</u> v. <u>Davis</u>, 426 U. S. 229 (1976), and <u>Village</u> <u>of</u> <u>Arlington</u> <u>Heights</u> v. <u>Metropolitan</u> <u>Housing</u> <u>Develop-</u> <u>ment</u> <u>Corp.</u>, 429 U. S. 252 (1977). <u>See</u> <u>Sprinkellink</u> v. <u>Wainwright</u>, 578 F.2d 582 (1978).

ZZ. Petitioner has failed in his final allegation of error to "clearly set forth (any) alleged violation or violations" as required by Section 46-21-104, MCA, and his claim therefore fails as a matter of law.

Dated this 1$ day of February, 1981.

A B Martin

DISTRICT JUDGE

COPY TO: John Maynard
John Forsythe
Charles F. Moses

Star Printing Co. Miles City, Mont.